In re **MISSION MARINE ASSOCIATES, INC., a Corporation of the State of California authorized to do business in New Jersey, Debtor.**

**FUQUA INDUSTRIES, INC., a Delaware Corporation, Plaintiff,**

v.

**MISSION MARINE ASSOCIATES, INC.; A. J. Armstrong Company, Inc. and Lazere Financial Corporation, Defendants.**

**Bankruptcy No. B–79–01241.**

United States Bankruptcy Court, D. New Jersey.

April 14, 1980.

544

See also, Bkrtcy., 3 B.R. 548.

Cohen, Pincus, Verlin, Hahn, Reich & Sherzer by Pace Reich, and Joseph S. U. Bodoff, Philadelphia, Pa., and Stephen D. Morgan, Haddonfield, N. J., for Irvine Fasteners, Inc.

Ravin & Kesselhaut by David N. Ravin, West Orange, N. J., for Fuqua Industries, Inc.

Blank, Rome, Comisky & McCauley by Matthew J. Siembieda, Philadelphia, Pa., and Fluharty, Freeman, Gerstein & Mintz by E. Stevenson Fluharty, Haddonfield, N. J., for A. J. Armstrong Co., Inc.

Lehman & Wasserman by Robert B. Wasserman, Millburn, N. J., for debtor.

## OPINION

WILLIAM LIPKIN, Bankruptcy Judge.

This matter arises out of a Complaint filed by Fuqua Industries, Inc. (Fuqua) to establish a lien on the assets of the Debtor, Mission Marine Associates, Inc. (Mission). Mission recognizes that Fuqua's lien, if any, is subordinate to the lien executed in favor of A. J. Armstrong, Inc. (Armstrong).

Fuqua's complaint consists of five counts. The First and Second Counts, dealing with advances of money secured by real estate mortgages and financing statements on personal property, are the subject matter of this opinion. The remaining counts are not being pressed for determination.[1]

Irvine Fasteners, Inc. (Irvine), a creditor of the debtor, disputes the validity of a lien in favor of Fuqua.

Briefly the facts are as follows:

On September 17, 1976 Mission became obligated to Fuqua, as evidenced by two notes in the sums of $1,375,000. and $500,-000. respectively. The notes were subordinated to the debtor's obligation to Armstrong. The notes further provided that they were secured by a perfected lien on all the assets of the debtor. An additional promissory note was executed in the sum of $500,000. on October 29, 1976, containing the same provisions as the previous notes, as to security terms, etc. I shall skip over the exhibits offered which relate to a settlement and note dated March 31, 1977 between Fuqua and Mission and others, which resolved a dispute as to the value of the assets and amount of liabilities.[2] I also shall skip over the note dated June 23, 1977 in the sum of $800,000., which recites the same provisions of the other notes.

█ The basis of contention finally comes down to an interpretation of instruments offered in evidence, dated March 15, 1978, and a determination of the effect of same. They consist of a Pledge Agreement and two notes, in the respective sums of $3,175,-000. and $900,000., payable by Mission to Fuqua.

The Pledge Agreement was entered into by and between Fuqua, David Trumbull, Maurice Cunniffe, Philip R. Gustlin and Buster Hammond, designated as "Shareholders", and Mission. The Pledge Agreement provided for the Shareholders to escrow all the stock owned by them to Fuqua.

It is clear from the testimony that Mission was having financial difficulty at the time of the execution of the Pledge Agreement and Notes. It is also clear from the terms of the Pledge Agreement and the Notes executed by the parties that the escrow of stock referred to in the Pledge Agreement was not a novation and substitution of such collateral security in place of the mortgages and security agreement theretofore executed in favor of Fuqua. The personal property in California was validly secured by the filing of a Financing Statement with the Secretary of State in Sacramento. The two real estate mortgages on real estate of the debtor in New Jersey in the sum of $1,000,000. and $146,-000., plus an assignment of a mortgage on real estate mortgaged to Aetna Insurance Company in the sum of $82,000, the principal of which had been paid to Aetna by Fuqua, were proven to be properly recorded.

I find that the Pledge Agreement referred to above did not substitute the stock escrow as security for the indebtedness as contended by Irvine. It is clear from that instrument that it was only additional security for the debt that already existed. Fuqua did not become the owner of the assets of Mission by reason of the stock pledge. The operation of the business remained with Mission. The fact that Mission had to report on its financial affairs to Fuqua did not create a merger of the debt due it with ownership. Fuqua did not participate in the day by day operation or assume such dominion and control as to constitute Mission a subsidiary of Fuqua.

█ The other ground upon which Irvine seeks to set aside the liens of Fuqua must also be denied. Irvine seeks to have the

---

1. The Third Count deals with an obligation arising out of a warranty involving Miller Yacht Sales, a subsidiary of Fuqua. Count Four deals with the doctrine of marshalling of assets and Count Five deals with assertions of a maritime lien based upon the District Court opinion expressed in the "Penske" case.

2. The Settlement Agreement, paragraph 6, refers to the Security Agreement attached to the Agreement as Exhibit C as does the note, paragraph (e), page 4, and (e)2, page 7.

lien declared invalid upon the ground that a new security agreement was not executed in 1978 when the Pledge Agreement and two notes were executed. The financing statement filed with the Secretary of State of California on November 24, 1976, together with the Security Agreement executed at that time in 1976, created a valid security interest in Fuqua in the personal property listed therein such as equipment, machinery, molds, inventory, etc. Furthermore, the notes executed at the time of the transaction referred many times to the obligation as a secured one.[3] The purpose of filing a Financing Statement is to give notice to other creditors of the existence of a possible lien. That purpose is served when supported by a security agreement.

It is not necessary that the Security Agreement be encompassed in one instrument. In this matter the Pledge Agreement has sufficient references therein to identify the existence of a Security Agreement and Fuqua's status as a secured creditor. The preamble and the witnessing paragraph designate Fuqua as a secured creditor. If a default occurred Fuqua, at its option, could dispose of its collateral in accordance with the rights of a secured creditor under the California Uniform Commercial Code—Secured Transactions. The

Pledge Agreement further provided in paragraph 12: "The rights of the Secured Party provided for hereunder shall be cumulative and non-exclusive, any exercise of one shall not preclude the exercise of any other right afforded by law."

There was a properly executed security agreement effected in 1976 with a recorded Financing Statement filed in California in that year which are still effective as of this date on assets situated in the State of California. That Security Agreement has not been voided and the instruments executed in 1978, consisting of the Pledge Agreement and notes, are sufficient to constitute Fuqua as a secured creditor. The notes and the Pledge Agreement executed on March 15, 1978 have sufficient references therein to satisfy the requirements of the Uniform Commercial Code.[4]

The foregoing conclusions of law, based upon the facts in this case, are mandated by the decision of the Third Circuit Court of Appeals, filed February 8, 1980, *In the Matter of Bollinger Corporation, Bankrupt*, 614 F.2d 924. The Court in *Bollinger* rendered an interpretation of the law of the Commonwealth of Pennsylvania dealing with the Uniform Commercial Code. Since the

---

**3.** See Page 3(e) "This Note is secured by a perfected lien on all of the assets of the Obligor, which lien is second only to a similar lien securing the Senior Indebtedness (hereinafter referred to as the "Security Assets")." "(f) . . . Loan Agreement . . . ." Page 4, "(g) . . . Security Assets . . . " Page 6(e) recites execution of Agreement of Sale, Security Agreement and Financing Statement.

**4.** page 2, "The Obligor covenants and agrees . . . (a) follows:

"(a) The principal of and interest on this Note are and shall only be subordinated in right of payment, to the extent set forth in paragraphs (b) through (d) inclusive, to all obligations for the repayment of indebtedness to be incurred by the Obligor pursuant to the terms of the Loan Agreement between Obligor and A. J. Armstrong Co., Inc., dated October 29, 1976, . . . ." It is clear that Armstrong is a secured creditor and Fuqua was assuming a secondary position to it.

The next paragraph recognizes the right to payment first to the Senior Indebtedness.

Paragraph (e), page 3 of the Note, provides: "This Note is secured by a perfected lien on all of the assets of the Obligor, which lien is second only to a similar lien securing the Senior Indebtedness (hereinafter referred to as the 'Security Assets')".

Paragraph (f) refers to the " . . . aforesaid Loan Agreement, without regard to any amendments thereof, shall be deemed to be also for the benefit of the holder of this Note and are hereby incorporated in this Note and may be exercised by the holder of this Note as if specifically set forth herein, and shall be construed as if the noteholder referred to in such covenants were the holder of this Note."

See also paragraph (e), page 6, which provides:

"An event of default shall have occurred under any of the following agreements among the Obligor and the Obligee:

1. Agreement of Sale.
2. Security Agreement.
3. Financing Statement.
4. Pledge Agreement and Exhibit A."

State of New Jersey has adopted the same uniform law, I am of the opinion that the principles declared in *Bollinger* are applicable to similar situations in New Jersey. Therein the Third Circuit held,

> When the parties have neglected to sign a separate security agreement, it would appear that the better and more practical view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral. Id. at 928.

In that case the relevant writings were:

> . . . (1) the promissory note; (2) the financing statement; (3) a group of letters constituting the course of dealing between the parties. Id. at 928.[5]

In the *Bollinger* case the court held as follows:

> . . . there is sufficient evidence that the parties intended a security agreement to be created separate from the assigned ICC agreement with Bollinger. All the evidence points towards the intended creation of such an agreement and since the financing statement contains a detailed list of the collateral, signed by Bollinger, we hold that a valid Article Nine security agreement existed . . . .
>
> The minimal formal requirements of section 9–203(1)(b) were met by the financing statement and the promissory note, and the course of dealing between the parties indicated the intent to create a security interest. Id. at 929.

The facts in the present case are even more persuasive of the existence of a valid security interest. The original security agreement of 1976 was never voided; and was later supplemented by the Pledge Agreement of 1978; and all the notes reflected a security interest; and the filed Financing Statement contained a detailed list of the collateral.

Finally, I note that paragraph 10, page 7, of the Pledge Agreement recites that the Agreement was intended to be formed in the State of California, and shall be deemed to be a California contract; " . . . and shall be construed and enforced in accordance with the laws of such State; . . ". The assets upon which a lien is sought to be impressed are all in California. Was a lien validly perfected in California? As pointed out in the *Bollinger* case, California is more liberal in recognizing the validity of liens than the Third Circuit.[6] The case of *In Re Amex-Protein Development Corporation*, 504 F.2d 1056 (9 Cir. 1974), expounds the applicable law of that Circuit.

Under the guide lines of that decision, since the assets are in California, the validity of Fuqua's security agreement is clearly established. As expressed by the Third Circuit.

> It [meaning the Ninth Circuit] concluded that as long as the financing statement contains a description of the collateral signed by the debtor, the financing statement may serve as the security agreement and the formal requirements of section 9–203(1)(b) are met. *In re Bollinger*, 614 F.2d at 927.

In the *Amex-Protein* case the debtor had signed notes, and the court from over all reading of the instruments ruled in favor of the creditor as one of secured status.

Therefore based both upon (1) the effect of the law in the Third Circuit whereby the creditor, Fuqua, had proven a security agreement in 1976 which was never cancelled, and a Pledge Agreement in 1978 which recognizes the secured status of Fuqua, and the detailed notes evidencing the indebtedness, which notes also refer to the secured status of Fuqua, and the filed Financing Statement which contained a detailed listing of the collateral and (2) the effect of the law of the Ninth Circuit, where the collateral is located, which, as set forth, does not require the same degree of supporting instruments to spell out a valid

---

**5.** It was stated therein that a note standing alone cannot serve as a security agreement. Id. at 928.

**6.** The Third Circuit, in the *Bollinger* case, declined to follow the Ninth Circuit's liberal rule.

security interest, I conclude from the facts and law applicable thereto that Fuqua has a valid security interest in the assets in California as itemized in the Financing Statement filed in that State on November 24, 1976.

I find that Fuqua has a mortgage on the real estate in New Jersey to the extent due on the mortgages filed in the State of New Jersey, but has no security interest in the chattels located in the State of New Jersey due to its failure to perfect its lien thereon. The amount to be realized on the real estate mortgages shall be applied on account of the entire indebtedness due Fuqua.

Fuqua has heretofore submitted a form of Order in this matter which includes a blanket provision that it, "has a valid and subsisting second lien upon machinery, equipment, buildings and fixtures, affixed to real estate of the debtor located in the State of New Jersey as described in the mortgages set forth hereinabove". That provision is overbroad and, in effect, seeks to cure Fuqua's failure to file a Financing Statement with the Secretary of State of New Jersey upon chattels located in New Jersey.

It has been admitted by Fuqua that it has no lien on chattels in the State of New Jersey. Whether any attachments to real estate become appurtenant thereto and part of the realty depends upon the intention of the parties and the "institutional theory"; a law well established in New Jersey. Therefore, for the purpose of resolving the instant issue before this court, the mortgages will constitute a lien only on the tangible real estate in New Jersey, and the other question is to abide further hearing, if necessary, upon filing proper pleadings for that purpose.

For the foregoing findings of fact and conclusions of law, an Order may be entered in accordance therewith.