Theodore **KING** and Aniello Madonna, as Trustees of Local 282 International Brotherhood of Teamsters Welfare, Pension, Annuity, Job Training and Vacation/Sick Leave Trust Funds, Plaintiffs,

v.

**TUXEDO ENTERPRISES, INC. and Mayrich Construction Corp., Defendant.**

No. 94 CV 4858.

United States District Court, E.D. New York.

Aug. 22, 1997.

**450**

Avram H. Schreiber, New York City, for plaintiffs.

Greenstein, Starr, Gerstein & Renaldi, P.C., New York City (Stephanie Freeman Goldstein, of counsel), for defendant Mayrich Construction Corp.

James E. Young, Jr., Hackensack, NJ, for defendant Tuxedo Enterprises, Inc.

### MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs, trustees of various trust funds for Local 282 of the International Brotherhood of Teamsters, brought this action against defendants Tuxedo Enterprises, Inc. (Tuxedo) and Mayrich Construction Corpora-tion (Mayrich) to recover unpaid employee fringe benefit contributions. This court has jurisdiction pursuant to the Employee Retirement Income Security Act of 1974, *see* 29 U.S.C. §§ 1132 and 1145, the Labor Management Relations Act of 1947, *see* 29 U.S.C. § 185, and 28 U.S.C. § 1367.

In an Order dated August 13, 1996, the court struck defendant Tuxedo's answer and directed entry of default against it. On October 15, 1996, judgment was entered against Tuxedo in the amount of $40,367.82, representing the amount outstanding as well as interest and attorneys' fees.

Plaintiffs now move for summary judgment against defendant Mayrich.

### I.

The following relevant facts are undisputed.

On December 16, 1993, Tuxedo entered into a letter agreement with plaintiffs for payment of $73,038.71 in employee fringe benefit contributions (the Agreement).

The Agreement provided that Tuxedo make an initial payment of $17,000, another payment of $21,500, and then ten equal monthly installments of $3,453.87 each. Payment of the monthly installments was to begin on February 20, 1994.

Tuxedo promised in the Agreement to execute as security an assignment of accounts receivable from Mayrich, "together with appropriate security interests, UCC–1s." Tuxedo was to make payments to plaintiffs by joint check with Mayrich, or in the alternative by its own certified checks or money orders.

On December 20, 1993 Tuxedo executed a UCC–1 financing statement indicating that plaintiffs had a security interest in Tuxedo's Mayrich account. The UCC–1 was filed and recorded in Bergen County, New Jersey on December 28, 1993 and with the New Jersey Department of State on January 7, 1994.

Tuxedo made the $17,000 and the $21,000 payments as required, but failed to begin making the monthly payments provided for in the Agreement. Therefore, on March 11, 1994 plaintiffs notified Mayrich by letter that

the Tuxedo account had been assigned to plaintiffs by Tuxedo and that all future payments should be made directly to them. The letter specified which account had been assigned and had attached a copy of the UCC–1 and notice of assignment.

On March 15, 1994, following a telephone conversation with individuals at Mayrich, plaintiffs sent another letter to Mayrich, this time including copies of the UCC–1 and of the Agreement. The letter demanded again that Mayrich make all future payments directly to plaintiffs.

Tuxedo then failed to make the March, April and May payments. Accordingly, after each missed payment, plaintiffs sent, return receipt requested, notification to Mayrich, advising it of the assignment and demanding payment. The notification dated May 31, 1994 summarized all the previous notices sent, requested a list of amounts due and owing by Mayrich to Tuxedo, and informed Mayrich that if it did not make the payment demanded within seven days, plaintiffs would commence suit.

Around this time, Tuxedo paid plaintiffs four $3,453 installments for the months February through May. But Tuxedo did not pay the June installment. On July 12, 1994, plaintiffs once again notified Mayrich by letter about the assignment.

On July 22, 1994 plaintiffs sent Mayrich an Information Subpoena with Restraining Notice. On August 11, 1994 plaintiffs advised Mayrich of its failure to respond to the Information Subpoena. Plaintiffs say that a few days later an attorney for Mayrich contacted plaintiffs and informed them that Mayrich intended to pay in full the amount due and therefore would not be responding to the subpoena.

On August 12, 1994 plaintiffs sent another letter to Mayrich summarizing Mayrich's obligations under the assignment. The letter also stated that "if this office is advised that Mayrich Construction Corp. has paid money to Tuxedo Enterprises, Inc. since the date of the first notice, then this office will take any and all actions necessary to protect the interests of our clients." No response was received from Mayrich.

Plaintiffs commenced this action on October 17, 1994. In the course of discovery, plaintiffs say they found out that between December 1993 and August 1994, Mayrich made twenty-five payments directly to Tuxedo. These payments totaled $993,000, $300,000 of which Mayrich paid to Tuxedo after receiving notification of the assignment from Mayrich.

Plaintiffs seek to recover the amount outstanding under the Agreement, $20,723.23, as well as interest, attorneys' fees, costs and disbursements.

## II.

Plaintiffs, the assignees, move for summary judgment on the ground that Mayrich, the account debtor, received notification of the assignment and thus was legally obligated to either request proof of the assignment or begin making payments to plaintiffs.

Under Federal Rule of Civil Procedure 56(c) the court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the movants are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On the motion the court views the record in the light most favorable to the non-movant and resolves all ambiguities and draws all reasonable inferences against the movants. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## III.

The court has supplemental jurisdiction over plaintiffs' claim against Mayrich, 28 U.S.C. § 1367, and the question of whether a valid assignment exists is determined under state law. A federal court adjudicating a pendent state law claim applies the choice of law rules of the forum state. *See Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir.1989). Under New York choice of law rules, the court applies the law of the state having the most significant contacts to the underlying transaction. *Lazard Freres &*

*Co. v. Protective Life Ins., Co.*, 108 F.3d 1531, 1539 (2d Cir.1997) (discussing "grouping of contacts" test used by New York courts) (citation omitted), *petition for cert. filed,* 66 U.S.L.W. 3108 (U.S. July 21, 1997) (No. 97–125).

Here there is insufficient evidence to determine whether New York or New Jersey law applies. Plaintiffs and Mayrich are both New York residents. Tuxedo is a New Jersey corporation. It is unclear where the underlying contract was executed. While the financing statements were filed in New Jersey, the funds at issue represent unpaid employee fringe benefit contributions on behalf of a New York local of a national labor union.

Both parties have assumed the applicability of New York law. Accordingly, the court will rely principally on New York law. In any event, both New York and New Jersey have adopted the Uniform Commercial Code (the Code), the law relevant to this motion, and the outcome would be the same regardless of which state's law governs.

### A.

Mayrich says that Tuxedo, the assignor, retained control over the accounts receivable and thus no valid assignment existed.

■ Mayrich's argument is misplaced. It is true that an assignment is invalid where the assignor retains control over the funds, *see Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir.1976) (quoting *Advance Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (N.Y.Sup.Ct.1953)), and here it is clear that Tuxedo retained such control. It had the option of making timely payments to plaintiffs and could receive the amounts due from Mayrich directly.

■ But the assignor need not divest control over the funds if he or she intends a "conditional assignment" as security, i.e. an assignment of claims payable in the future to secure performance of an independent obligation. *See Miller,* 540 F.2d at 558–59 (quoting *Maloney v. John Hancock Mutual Life Insurance Co.*, 271 F.2d 609, 614 (2d Cir. 1959)). When such assignment is made to secure a loan, "the transfer is conditioned upon the assignor's default in repayment of the loan," *Id.*

Thus, unlike most assignments, the essential feature of a conditional assignment is that the assignor retains title to the collateral, so long as he or she continues to perform his or her contractual obligations to the assignee. The assignment is effected only if the assignor is in default to the assignee. *See In re Pearl–Wick Corp.*, 26 B.R. 604 (S.D.N.Y.), *aff'd,* 697 F.2d 291 (2d Cir.1982); *Maloney,* 271 F.2d at 614.

Here the parties plainly contemplated the creation of a "conditional assignment" as security. The agreement provides that the assignment of the Mayrich account will operate as "security for payment of the debt," and so long as Tuxedo made timely payments to plaintiffs, it, and not plaintiffs, would receive the payments due from Mayrich.

Whenever a security interest is intended, Article 9 of the Code applies, regardless of the form of the transaction. *See* N.Y.U.C.C. § 9–102; N.J.Stat.Ann. § 12A:9–102.

Section 9–203 of the Code determines whether a security interest is enforceable. It states in pertinent part: "the security interest is not enforceable ... unless ... the debtor has signed a security agreement which contains a description of the collateral...." N.Y.U.C.C. § 9–203(1)(a); N.J.Stat. Ann. § 9–203(1)(a). A "security agreement" is defined in the Code as an "agreement which creates or provides for a security interest." N.Y.U.C.C. § 9–105(1)(*1*); N.J.Stat. Ann. § 12A:9–105(1)(*l*).

■■ A security agreement, like an assignment, need not be embodied in a formal document. *See In the Matter of Candy Lane Corp.*, 38 B.R. 571 (Bkrtcy.S.D.N.Y.1984); *In re Mission Marine Associates, Inc.,* 3 B.R. 543, 546 (Bkrtcy.D.N.J.1980). Rather, it is sufficient that there exist, in addition to a standard form financing statement, some written evidence of the assignor's intent to grant the security interest. *In re Modafferi*, 45 B.R. 370, 372 (S.D.N.Y.1985) (summarizing cases that have read finance statement together with other documents to find a valid security interest); *In re Mission Marine Associates,* 3 B.R. at 546–47 (applying, under

New Jersey law, principle that security agreement can be deduced from a variety of documents). Such written evidence must include the debtor's signature and an adequate description of the collateral. *See In re Coffee Cupboard, Inc.*, 33 B.R. 668, 672 (Bkrtcy. E.D.N.Y.1983). A financing statement "standing alone, does not constitute a security agreement" but indicates only that the secured party may have an interest in the described collateral. *In re Modafferi*, 45 B.R. at 372.

■ Here the parties created a valid security interest. The document purporting to constitute the assignment of accounts receivable admittedly does not contain a description of the collateral. But the letter agreement between plaintiffs and Tuxedo, read together with the UCC–1 financing statement, is sufficient to constitute a security agreement and a conditional assignment under the Code. In the Agreement, Tuxedo promises "as security for the payment of this debt" to execute an "assignment of accounts receivable from Mayrich, together with appropriate security interests, UCC–1s." The Agreement explains that Tuxedo will sign two UCC–1 forms and an assignment of the accounts. The financing statements were executed, as was a general assignment form. This is enough to indicate an intent to give plaintiffs a security interest in the Mayrich account.

### B.

Mayrich says that while it received notice of the purported assignment, it did not think the documents constituted a valid assignment.

■ But Mayrich is not entitled to a good faith defense. The rights and defenses available to Mayrich, as account debtor, are determined under § 9–318 of the Code, even when the assignment is conditional for the purposes of creating a security interest. *See Chase Manhattan Bank (N.A.) v. State*, 40 N.Y.2d 590, 388 N.Y.S.2d 896, 357 N.E.2d 366 (1976) (applying § 9–318 to determine whether court could enforce assignment of accounts receivable and other personal property for purposes of security against account debtor).

■ Under § 9–318(3), an account debtor is "authorized to pay the assignor" until he or she is notified that the amount due "has been assigned and that payment is to be made to the assignee." N.Y.U.C.C. § 9–318(3); N.J.Stat.Ann. § 12A:9–318(3). Notice of the assignment need not be in any particular form, *see General Motors Acceptance Corp. v. Albany Water Bd.*, 187 A.D.2d 894, 896, 590 N.Y.S.2d 312, 313 (3d Dep't, 1992), and notice of a fact is presumed if an account debtor has actual knowledge of it, has received notice of it, or from "all the facts and circumstances known to him at the time[,]" has reason to know that it exists, N.Y.U.C.C. § 1–201(25); N.J.Stat.Ann. § 12A:1–201(25). *See also Banque Arabe et Internationale D'Investissement v. Bulk Oil (USA) Inc.*, 726 F.Supp. 1411, 1418 (S.D.N.Y. 1989).

■ If the account debtor doubts the adequacy of the notification or the validity of the assignment, he or she may not disregard the notice, but must request the assignee to furnish "reasonable proof that the assignment has been made." *Banque Arabe*, 726 F.Supp. at 1418. *See also* N.Y.U.C.C. § 9–318, Official Comment 5; N.J.Stat.Ann. § 12A:9–318, Official Comment 5. If doubts persist, "the account debtor may not be safe in disregarding [the notice] unless he has notified the assignee with commercial promptness as to the respects in which identification or proof is considered defective." N.Y.U.C.C. § 9–318, Official Comment 5; N.J.Stat.Ann. § 12A:9–318, Official Comment 5.

■ It is undisputed that beginning with the March 11, 1994 facsimile, Mayrich was put on notice that Tuxedo had assigned its accounts receivable to plaintiffs. That letter specified which account had been assigned and that payment should be made directly to plaintiffs. Furthermore, plaintiffs also forwarded to Mayrich a copy of the Agreement in which Tuxedo promises to execute an assignment of the Mayrich accounts as security, and a copy of the UCC–1 form recording

their security interest in Tuxedo's Mayrich accounts.

If Mayrich doubted the validity of the assignment, it should have protested or asked for further proof. It did not do so and now can be held liable for the outstanding amount due on Tuxedo's debt to plaintiffs.

### C.

Finally, Mayrich says that plaintiffs waived whatever rights they had under the assignment by permitting Mayrich to continue to make payments to Tuxedo.

An assignee waives its rights if it fails to protest the account debtor's remittance of funds directly to the assignor. *See General Motors Acceptance Corp. v. Clifton–Fine Central School Dist.,* 85 N.Y.2d 232, 235–36, 623 N.Y.S.2d 821, 822–23, 647 N.E.2d 1329, 1330–31 (1995).

But plaintiffs claim, and Mayrich does not dispute, that they had no knowledge that Mayrich was making regular payments to Tuxedo until September 1996, after the suit was filed. Even if plaintiffs did know about these payments, they repeatedly demanded that Mayrich pay them directly, thereby precluding the finding of a waiver. *Cf. id.* (plaintiff's failure to tell assignee that payment should be made to it precluded summary judgment).

It is undisputed that, for the purposes of creating a security interest, Tuxedo conditionally assigned to plaintiffs its Mayrich accounts receivable. Mayrich had notice of this assignment but failed to respond in any way.

### IV.

The court grants plaintiffs' motion for summary judgment and directs entry of judgment against Mayrich in the amount of $20,723.23. The court refers to Magistrate Judge A. Simon Chrein for report and recommendation the determination of whether plaintiffs are entitled to attorneys' fees, interest, costs and disbursements, and if so, in what amount.

So ordered.