### In re OUTBOARD MARINE CORPORATION, et al., Debtors.

**Bank of America, N.A., successor in interest to Bank of America, N.A., formerly Nationsbank, N.A., successor in interest to Nationsbank of Texas, N.A., in its capacity as Prepetition Agent and DIP Agent, Plaintiff,**

v.

**Outboard Marine Corporation, et al., Defendants.**

Bankruptcy No. 00 B 37405.
Adversary No. 01 A 00471.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 20, 2003.

Larry J. Nyhan, Sidley, Austin, Brown & Wood, Bank One Plaza, Chicago, IL, for Movant or Plaintiff.

Jeffrey C. Dan, Crane, Heyman, Simon, Welch & Clar, Chicago, IL, for Makino, Inc.

## AMENDED MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of Makino, Inc. ("Makino") for partial summary judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56 on the complaint filed by Bank of America, N.A. (the "Bank") seeking a determination of the extent, validity and priority of liens in the proceeds of certain machinery that Makino sold to Outboard Marine Corporation and its related debtor entities ("OMC"). For the reasons set forth herein, the Court finds that a material factual issue as to OMC's intent to create a security interest precludes disposition of this matter through summary judgment. Accordingly, the Court denies Makino's motion.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334

and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

## II. APPLICABLE STANDARDS

### A. Summary Judgment

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). *See also Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 402 (7th Cir.1998).

The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir.1990); *Farries v. Stanadyne/Chicago Div.*, 832 F.2d 374, 378 (7th Cir.1987), *quoting Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986). Where the material facts are not in dispute, the sole issue is whether the moving party is entitled to a judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir.1998). In 1986, the United States Supreme Court decided a trilogy of cases which encourages the use of summary judgment as a means to dispose of factually unsupported claims.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. 1348.

All reasonable inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). The existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir.1994). "[S]ummary judgment is not an appropriate occasion for weighing the evidence; rather, the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir.1990). The Seventh Circuit has noted that trial courts must remain sensitive to fact issues where they are actually demonstrated to warrant denial of summary judgment. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065–66 (7th Cir.2000); *Szymanski v. Rite–Way Maint. Co., Inc.*, 231 F.3d 360, 364 (7th Cir.2000).

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477

U.S. at 323, 106 S.Ct. 2548. Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings; rather its response must show that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Patrick v. Jasper County,* 901 F.2d 561, 565 (7th Cir.1990). The manner in which this showing can be made depends upon which party will bear the burden of persuasion at trial. If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy Rule 56's burden of production either by submitting affirmative evidence that negates an essential element of the non-moving party's claim or by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See Union Nat'l Bank of Marseilles v. Leigh (In re Leigh),* 165 B.R. 203, 213 (Bankr.N.D.Ill.1993) (citation omitted).

Rule 56(d) provides for the situation when judgment is not rendered upon the whole case, but only a portion thereof. The relief sought pursuant to subsection (d) is styled partial summary judgment. Partial summary judgment is available to dispose of only one or more counts of the complaint in their entirety. *Commonwealth Ins. Co. of N.Y. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir. 1959); *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216–17 (7th Cir.1946); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill. 1987); *Arado v. Gen. Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985); *Capitol Records, Inc. v. Progress Record Distrib., Inc.,* 106 F.R.D. 25, 28 (N.D.Ill. 1985); *Strandell v. Jackson County, Ill.,* 648 F.Supp. 126, 136 (S.D.Ill.1986); *In re Network 90 Degrees, Inc.,* 98 B.R. 821, 831 (Bankr.N.D.Ill.1989). Rule 56(d) provides a method whereby a court can narrow issues and facts for trial after denying in whole or in part a motion properly brought under Rule 56. *Capitol Records,* 106 F.R.D. at 29. In the case at bar, Makino seeks partial summary judgment as its motion relates only to the fourth defense asserted in its answer.

■ The parties have filed cross-motions for summary judgment. However, the Bank has failed to present its cross-motion to the Court in violation of the local bankruptcy rules. Specifically, Local Bankruptcy Rule 9013–1 provides that, with exceptions not applicable here, "[t]he date of presentment contained in a notice of motion shall be within 14 calendar days of the service of the notice." Local Bankr.R. 9013–1. "A local rule has the force of a statute and is binding on the . . . court as well as the parties." *Premier Elec. Constr. Co. v. Am. Nat'l Bank of Chicago,* 276 Ill.App.3d 816, 213 Ill.Dec. 128, 658 N.E.2d 877, 891 (1995) (citations omitted). A party moving for summary judgment must comply with all applicable local court rules and statutes. *Deaton v. Lloyd's Jewelry Co.,* 7 Ill.App.3d 926, 289 N.E.2d 123, 126 (1972) (citation omitted). "A motion that does not comply with the provisions of . . . Rule [9013–1] may be stricken by the court without prior notice." Local Bankr.R. 9013–1. In this case, the Bank filed a cross-motion for summary judgment, as well as notice of that filing, on August 29, 2003, but did not present its cross-motion within fourteen calendar days of the service of the notice. Accordingly, the Court strikes the Bank's cross-motion and proceeds by examining only Makino's motion for partial summary judgment.

Local Bankruptcy Rule 7056–1 of the Local Bankruptcy Rules for the United

States Bankruptcy Court for the Northern District of Illinois, which deals with summary judgment motions, was modeled after LR56.1 of the Local Rules of the United States District Court for the Northern District of Illinois. Hence, the case law construing LR56.1 and its predecessor Local Rule 12 applies to Local Bankruptcy Rule 7056–1.

Pursuant to Local Bankruptcy Rule 7056–1, a motion for summary judgment imposes special procedural burdens on the parties. Specifically, the Rule requires the moving party to supplement its motion and supporting memorandum with a statement of undisputed material facts ("7056–1 statement"). The 7056–1 statement "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. Failure to submit such a statement constitutes grounds for denial of the motion." Local Bankr.R. 7056–1B.

Makino filed a 7056–1 statement that fully complies with the Rule. It includes numbered paragraphs establishing undisputed facts with specific references to accompanying exhibits, as well as the affidavit of James McVicker ("McVicker"). McVicker is a vice president of Makino, as well as its chief financial officer. McVicker Aff. at ¶ 1. He states that, prior to December 22, 2000 (the bankruptcy petition date), Makino sold five pieces of machinery ("the Machinery") to OMC for over $2 million. *See id.* at ¶ 3. According to McVicker, each Makino invoice provided to OMC included Makino's terms and conditions of sale. *Id.* at ¶ 6. He also avers that Makino filed, or caused to be filed, a Uniform Commercial Code (UCC) financing statement which corresponds to Makino's purported security interest in the Machinery. *See id.* at ¶ 7. McVicker further

states that Makino filed a proof of claim for $2,557,240.85, of which $2,089,551.16 relates to the alleged secured claim corresponding to the Machinery. *Id.* at ¶ 9. Finally, McVicker asserts that OMC has yet to pay Makino and is indebted to the latter in the amount of over $2.5 million. *Id.* at ¶ 8.

The party opposing a summary judgment motion is required by Local Rule 7056–2 to respond ("7056–2 statement") to the movant's 7056–1 statement, paragraph by paragraph, and to set forth any material facts that would require denial of summary judgment, specifically referring to the record for support of each denial of fact. Local Bankr.R. 7056–2. The opposing party is required to respond "to each numbered paragraph in the moving party's statement" and to make "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Bankr.R. 7056–2A(2)(a). Most importantly, "[a]ll material facts set forth in the [7056–1] statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Local Bankr.R. 7056–2B.

The Bank has complied with this Rule in substance, but has deviated from the specific procedural directives set forth in the Rule. Although the Bank's response contains numbered items, corresponding to each paragraph in Makino's 7056–1 statement, twenty-three of the twenty-nine entries consist merely of the single word "Undisputed." The remaining entries, each of which is one or two short sentences in length, do not include specific references to any part of the record or to any supporting materials relied upon to bolster the facts set forth. Instead, the Bank refers the Court to the statement of facts provided in support of its cross-motion, filed concurrently with the 7056–2 state-

ment. It is in this document that the Bank includes numbered paragraphs, including references to supporting materials relied upon as required under the Rule. A majority of these paragraphs is identical to those in Makino's 7056–1 statement.

## B. Article 9 of the Uniform Commercial Code

■ State law governs the secured interests asserted by the parties in bankruptcy. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law.... The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests...."); *Worthen Bank & Trust Co. v. Hilyard Drilling Co., Inc. (In re Hilyard Drilling Co., Inc.)*, 840 F.2d 596, 599 n. 4 (8th Cir.1988), *citing Freeland v. Chaseley's Foods, Inc. (In re Chaseley's Foods, Inc.)*, 726 F.2d 303, 307 (7th Cir.1983) ("Applicable state law determines the extent and validity of liens on property in the bankruptcy estate."). Thus, the Court "look[s] to state law to ascertain what property the debtor owned immediately preceding the time of bankruptcy; what liens thereon, if any, then existed; the character thereof; and the order of priority among the respective creditors holding such liens." *Commercial Credit Co., Inc. v. Davidson (In re Chancellor)*, 112 F.2d 54, 55 (5th Cir.1940). Accordingly, whether Makino holds a secured interest in the Machinery sold to OMC is determined by state law.

In this matter, North Carolina's is the applicable state law.

■ Makino contends, and the Bank does not dispute, that former Article 9 governs this proceeding because it was this version of the UCC that was in effect at the time Makino allegedly created and perfected its security interest.[1] In fact, most courts look to the date of the bankruptcy case filing to determine which version of Article 9 applies. *Morris v. Gen. Motors Acceptance Corp. (In re Ball)*, 281 B.R. 706, 709–10 (Bankr.D.Kan.2002). *See also Kelaidis v. Cmty. First Nat'l Bank (In re Kelaidis)*, 276 B.R. 266, 270 (10th Cir. BAP 2002) (applying the old version of Article 9 when all events generating the appeal took place before the revision); *In re Payless Cashways, Inc.*, 273 B.R. 789, 791 (Bankr.W.D.Mo.2002); *Lustig v. Peachtree Settlement Funding (In re Chorney)*, 277 B.R. 477, 486 (Bankr. W.D.N.Y.2002); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 790 n. 3 (Bankr.D.Del. 2002); *In re Wiersma*, 283 B.R. 294, 299 (Bankr.D.Idaho 2002) (applying revised Article 9 when the bankruptcy filing occurred after the revision took effect). *But see Grabowski v. Deere & Co. (In re Grabowski)*, 277 B.R. 388, 390 (Bankr.S.D.Ill. 2002) (applying revised Article 9 even though both the bankruptcy filing and the transactions at issue predated the statute's effective date). In the case at bar, OMC filed for relief under Chapter 11 of the Bankruptcy Code on December 22, 2000. 7056–1 statement at ¶ 16. Thus, North Carolina's former version of Article 9 contains the relevant provisions for this Court to consider.[2]

1. The effective date of the revision of Article 9 was July 1, 2001. *See* N.C. Gen.Stat. § 25–9–702 (2003) (discussing, *inter alia*, pre-effective-date transactions, liens, and proceedings).

2. This conclusion is bolstered by § 25–9–702(c) of North Carolina's revised Article 9,

which notes that the current act "does not affect an action, case, or proceeding commenced before July 1, 2001." Accordingly, all citations to provisions of Article 9 will refer to the version in effect prior to the July 1, 2001 revision, unless otherwise indicated.

It bears further note that § 25–9–203 of both the former and revised versions of Arti-

Section 25–9–203 of North Carolina's enactment of the UCC sets forth the basic requirements for the enforceability and attachment of a security interest. Section 25–9–203(1) provides as follows:

[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

(a) the collateral is in the possession of the secured party pursuant to agreement, ... or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and

(b) value has been given; and

(c) the debtor has rights in the collateral.

N.C. Gen.Stat. § 25–9–203(1) (1999). Thus, before a security interest attaches, either the collateral must be in the possession of the secured party in accordance with an agreement between the parties, or the debtor must have signed a security agreement describing the collateral. *Id.* For nonpossessory security interests to be enforced in cases not involving land, the only technical requirements are (1) a writing, (2) the debtor's signature, and (3) a description of the collateral. *Id.; Evans v. Everett,* 279 N.C. 352, 183 S.E.2d 109, 111 (1971); *Little v. County of Orange,* 31 N.C.App. 495, 229 S.E.2d 823, 824 (1976).

Other sections of the UCC define relevant terms used in § 25–9–203. "Security agreement" means "an agreement which creates or provides for a security interest." § 25–9–105(1)(*l*). According to § 25–1–201(3), "agreement" means "the bargain of

the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance." § 25–1–201(3). The UCC defines "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." § 25–1–201(37). Finally, a "secured party" is "a lender, seller or other person in whose favor there is a security interest," and "debtor" means "the person who owes payment or other performance of the obligation secured." § 25–9–105(1)(m) and (d).

### III. UNDISPUTED FACTS AND BACKGROUND

Makino designs and manufactures machinery for enterprises in various fields, including those in the aerospace, automotive, diesel and die/mold industries. McVicker Aff. at ¶ 2. Throughout the middle months of 2000, Makino sold five pieces of machinery to OMC, the purchase price of which totaled $2,089,551.16. *See id.* at ¶ 3 and Makino's Exhs. 1(a) 1(e). Each invoice submitted to OMC included a two-page attachment setting forth Makino's "Terms and Conditions of Sale." 7056–1 statement at ¶ 10. The text appearing in paragraph 5 under the subhead "Delivery" of these terms and conditions reads as follows:

Makino hereby reserves a purchase money security interest in the equipment, all additions and accessions thereto and all proceeds thereof to secure payment of the purchase price due hereunder. Such security interest shall be retained until such purchase price is paid in full. Buyer shall permit Makino to file this agreement or financing statement(s) pursuant to the applicable Uni-

cle 9 is substantively the same. Therefore, which version is applied will not materially affect the outcome in this matter.

form Commercial Code or other applicable laws to evidence and/or perfect Makinos [sic] security interest in the equipment. On request, Buyer shall execute any and all agreements in this regard and assist Makino in the filing thereof. Until full payment for the equipment, Buyer shall not permit any liens or encumbrances to be placed on the equipment and shall cause any such liens or encumbrances to be promptly discharged.

Makino's Exh. 2. The other relevant paragraph appears under the subhead "Precedence" and states:

Makino['s] acceptance of an order is expressly made conditional on assent to the foregoing terms and conditions. Goods shipped prior to such assent are shipped as an accommodation only. If Buyer does not accept the goods on these terms, they are to be returned at once, unopened and unused, subject to prompt payment of appropriate cancellation charges. Otherwise, receipt of such goods will be deemed assent to the foregoing terms and conditions. Makino rejects any terms and conditions in Buyers [sic] order, or any other form of Buyer which, in any way, conflict with, reduce, or affect the foregoing terms and conditions. In the event of conflict between the foregoing and any other written or oral representations or understanding, the foregoing terms and conditions will control.

*Id.* Neither the invoices nor the terms and conditions on record bear the signature of a principal, agent or other representative of OMC.

On October 2, 2000, Makino filed, or caused to be filed, a financing statement with the North Carolina Secretary of State in accordance with the UCC. McVicker Aff. at ¶ 7 and Makino's Exh. 3. The financing statement refers to OMC as the "debtor" and to Makino as the "secured party"; it lists the five pieces of machinery sold to OMC as the property "covered" by the statement. Makino's Exh. 3. In Box 6 appear the words "Outboard Marine Corporation" with a signature on the line below them. *Id.*

On December 22, 2000, OMC filed a voluntary petition for relief under Chapter 11. 7056–1 statement at ¶ 16. Seven days later, OMC filed a motion to sell substantially all of its operating assets, in accordance with 11 U.S.C. § 363(b) and (f), free and clear of all liens, claims, encumbrances and interests. *Id.* at ¶ 18, *citing In re Outboard Marine Corp.,* Bankr.N.D. Ill. (Doc. # 56). On January 11, 2001, Makino filed a proof of claim for $2,557,240.85; $2,089,551.16 of this amount is allegedly a secured claim related to the Machinery sold to OMC. McVicker Aff. at ¶ 9. Subsequently, on February 9, 2001, this Court authorized the sale of substantially all of the assets associated with OMC's engine and boat businesses, including the Machinery at issue. 7056–1 statement at ¶ 20; Amended Compl. at ¶ 51.

On May 18, 2001, the Bank filed a complaint,[3] seeking the Court's determination as to the extent, validity and priority of liens in those assets connected to OMC's engine and boat operations which had been or were to be sold; the Bank also asked the Court to compel the turnover of the sale proceeds. Subsequently, on June 6, 2003, the Bank filed an amended complaint. On July 7, 2003, Makino filed an

---

**3.** Makino is just one of a number of defendants identified in the complaint. Amended

Compl. at ¶¶ 8 and 12–40.

answer, asserting six defenses.[4] At the same time, Makino filed the motion now before this Court for partial summary judgment based on the fourth defense, which asserts that "Makino holds liens in its collateral under applicable non-bankruptcy law that are senior to those held or asserted by any entity." July 7, 2003 Answer at 2. In short, Makino contends that it has an enforceable, properly perfected security interest in the Machinery sold to OMC, that its security interest is senior in priority to the one held by the Bank, and that Makino is, accordingly, entitled to receive the proceeds from the sale of the Machinery. In response, the Bank alleges that Makino does not hold a valid security interest in the Machinery because OMC never intended to create, grant or provide for such a security interest and because there is no documentation considered equivalent to a security agreement as required by North Carolina law.

## IV. DISCUSSION

### A. The Stipulation Staying the Briefing Schedule

As a preliminary matter, the Court addresses the stipulation filed by the parties on September 12, 2003 to stay the briefing schedule. Prior to that date, the Court set a briefing schedule, requiring the Bank to file a response to the instant motion for partial summary judgment by August 29, 2003; Makino's reply was due by September 12, 2003. Without consulting with or notifying the Court, and in complete disregard for the Court's order, the parties filed a stipulation staying the briefing schedule for sixty days to allow them "to conduct informal discovery and settlement discussions."

The Court will not tolerate the parties' blatant defiance of and disregard for its order. When this Court issues an order establishing a briefing schedule, the parties may not, with indifference and in complete disregard for that order, later agree amongst themselves to stay the schedule. Although the parties agreed to extend Makino's reply date to the Bank's response, the Court did not. That the parties may agree to an extension of a deadline imposed by the Court does not mean, *ipso facto*, that the Court also acquiesces. "Adherence to established deadlines is essential if all parties are to have a fair opportunity to present their positions." *Hill v. Porter Mem'l Hosp.*, 90 F.3d 220, 224 (7th Cir.1996). "Deadlines, in the law business, serve a useful purpose and reasonable adherence to them is to be encouraged." *Spears v. City of Indianapolis*, 74 F.3d 153, 157 (7th Cir.1996). As the Seventh Circuit has warned:

> Ignoring deadlines is the surest way to lose a case. Time limits coordinate and

---

4. The six defenses are, briefly, as follows:

(1) For paragraphs 1 through 280 of the Bank's amended complaint, Makino restates its answer filed on June 27, 2001. Makino does not have sufficient knowledge or information about the allegations in paragraphs 281 through 393 of the Bank's amended complaint and therefore neither admits or denies the allegations.

(2) The amended complaint fails to state a claim against Makino upon which relief may be granted.

(3) The written documents and/or court filings involved "speak for themselves."

(4) Makino holds liens in its collateral under applicable non-bankruptcy law that are senior to those held or asserted by any entity.

(5) The Bank's claims are barred, in whole or in part, by the principles of waiver, release, estoppel and laches.

(6) The Bank's claims are barred, in whole or in part, by applicable statutes of limitations.

See July 7, 2003 Answer at 2 and 3. Only the fourth defense is at issue in this matter, and this Opinion is so limited to that defense.

expedite a complex process; they pervade the legal system, starting with the statute of limitations. Extended disregard of time limits (even the non-jurisdictional kind) is ruinous. "Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won."

*United States v. Golden Elevator, Inc.,* 27 F.3d 301, 302 (7th Cir.1994), *quoting Northwestern Nat'l Ins. Co. v. Baltes,* 15 F.3d 660, 663 (7th Cir.1994). Accordingly, the Court will not consider Makino's belated filings and proceeds with the issuance of this Memorandum Opinion.

### B. *The Validity of Makino's Secured Claim*

Under Article 9 of the UCC, two documents are needed to create a perfected security interest in a debtor's collateral: a "security agreement" giving the creditor an interest in the collateral and a filed "financing statement" providing notice to other creditors that a security interest is claimed in the collateral. *See* N.C. Gen. Stat. §§ 25–9–203(1)(a) and 25–9–302(1) (1999). To create a security agreement, § 25–9–203 requires only (1) a writing, which is (2) signed by the debtor and (3) includes a description of the collateral. § 25–9–203(1)(a); *see also In re Bollinger Corp.,* 614 F.2d 924, 926 (3rd Cir.1980). Despite these few formal requisites, creditors often fail to comply with this uncomplicated Code provision. *Bollinger,* 614 F.2d at 926. In fact, just after the enactment of Article 9, numerous creditors who had filed financing statements but had neglected to create official security agreements sought to enforce secured claims. *Id.* Such is the case in the matter before this Court.

Makino filed a financing statement in compliance with the UCC. However, it failed to execute a formal security agreement. Nevertheless, Makino contends that the financing statement, read in combination with the language in the terms and conditions accompanying the invoices, constitutes a sufficient basis to find that a security agreement was created. This conclusion would then warrant the enforcement of the secured claim, because the financing statement was duly filed-and the claim therefore perfected-with the office of the North Carolina Secretary of State.[5] The Bank, on the other hand, seeks a finding that the documents in this case, standing alone, without the language of an actual security agreement, cannot serve as a security agreement.

At the heart of the matter is the construction of the attachment and enforceability provisions of North Carolina's enactment of the UCC. Specifically at issue is, first, whether a formal security agreement is required under Article 9. If it is not, the second question to be addressed is whether the invoices in this case, combined with the financing statement, qualify as a security agreement in compliance with § 25–9–203. Because the statutory provision is part of a uniform law, both the statute itself and decisions from other UCC jurisdictions provide the foundation for disposition of the question at issue. *See In re Carmichael Enters., Inc.,* 334 F.Supp. 94, 95 (N.D.Ga.1971), *aff'd,* 460 F.2d 1405 (5th Cir.1972).

#### 1. *The Writing Requirement*

The first issue to consider is whether a formal security agreement is required by § 25–9–203. The case law that has addressed this issue has focused on the dis-

---

**5.** The parties do not dispute that value was given by Makino or that OMC had rights in the collateral as required by § 25–9–203.

tinctions between security agreements and financing statements, as well as the divergent purposes that each one serves. Unlike a security agreement, a financing statement need be only " 'a skeletonic statement' that the parties intend to engage in future transactions, which may never be consummated." *Evans v. Everett,* 279 N.C. 352, 183 S.E.2d 109, 112 (1971). Ultimately, while a security agreement creates a security interest, a financing statement, " 'if properly filed, perfects that security interest against the rights of certain third parties.' " *Farmers Coop. of Ashford, Inc. v. People's Cmty. Bank of Ashford (Ex parte People's Cmty. Bank of Ashford),* 775 So.2d 819, 823 (Ala.2000) (citation omitted).

An examination of the UCC reveals that the purposes served by the two documents are entirely different. The formal requirement that a security agreement must be in writing is in the nature of the statute of frauds. *Little v. County of Orange,* 31 N.C.App. 495, 229 S.E.2d 823, 825 (1976) (citing N.C. Gen.Stat. § 25–9–203, Official Comment 5); *In re Murray Bros., Inc.,* 53 B.R. 281, 283 (Bankr. E.D.N.C.1985). That is, the signed-writing requirement prevents the enforcement of claims based on entirely oral representations. *Blank v. Numeric Corp. (In re Numeric Corp.),* 485 F.2d 1328, 1331 (1st Cir.1973) (citation omitted). " '[W]hen bankruptcy occurs[,] the anti-fraud function of the written security agreement serves mostly to protect third-party creditors.' " *Murray Bros.,* 53 B.R. at 283, *quoting* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 23–3, at 903 (2d ed.1980); N.C. Gen.Stat. § 25–9–203, Amended Official Comment 5. The security agreement also serves an evidentiary function in order to foreclose the possibility of disputes as to exactly which items of property are covered by a security interest. *Numeric,* 485 F.2d at 1331 (citation omitted); *Equibank v. H.L. Clement Co. (In re H.L. Clement Co.),* 12 B.R. 165, 168 (Bankr. W.D.Penn.1981) (citation omitted).

In contrast, a financing statement merely notifies the public that a security interest might exist in the listed collateral. *Bollinger,* 614 F.2d at 926; *Rice v. Citizens First Bank of Fordyce (In re Cheqnet Sys., Inc.),* 227 B.R. 166, 169 (Bankr.E.D.Ark.1998) (noting that the financing statement is "a mere notice document"); *H.L. Clement Co.,* 12 B.R. at 168 (citation omitted); *Zoltanski v. Prod. Credit Assoc. (In re Hite),* 4 B.R. 547, 549 (Bankr.N.D.Ohio 1980) (citation omitted) (observing that "[t]he policy behind the financing statement requirement is clearly that of notice filing."); *Mountain Farm Credit Serv. v. Purina Mills, Inc.,* 119 N.C.App. 508, 459 S.E.2d 75, 80 (1995) (finding that a financing statement serves to "provide notice to third parties of the debtor-creditor relationship"). The Amended Official Comment accompanying § 25–9–402, the section of North Carolina's former Article 9 that sets forth the formal requisites of the financing statement, elaborates on the notice-filing system:

What is required to be filed is not ... the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs. § 25–9–402, Amended Official Comment 2. Indeed, the aim of a notice-filing statute is to protect creditors by " 'furnishing to others intending to enter a transaction with the debtor a starting point for investiga-

tion which will result in fair warning concerning the transaction contemplated.'" *Advanced Analytics Laboratories, Inc. v. Envtl. Aspecs, Inc. of N.C. (In re Envtl. Aspecs, Inc.)*, 235 B.R. 378, 385–86 (E.D.N.C.1999) (citation omitted). Further inquiry, beyond the financing statement, is thus required, with the burden of that inquiry placed on anyone in search of additional information. *Id.* at 386 (citation omitted).

The UCC provides that a security agreement may serve as a financing statement if it includes the information required of a financing statement and is signed by the debtor. § 25–9–402, Amended Official Comment 1. However, the UCC is silent about whether a financing statement may serve as a security agreement. The first case to consider the question was *American Card Co. v. H.M.H. Co.*, 97 R.I. 59, 196 A.2d 150 (1963). Applying the Rhode Island versions of § 9–203, which provided the formal requirements for attachment, and § 9–402, which stated that some security agreements may serve as financing statements if filed, the Rhode Island supreme court held that the financing statement at issue failed to qualify as a security agreement because it did not contain any technical words of grant or conveyance. *Id.*, 196 A.2d at 151–52.

*American Card's* "express grant rule" has been fiercely criticized and ultimately rejected. *See, e.g., Cont'l Can Co., Inc. v. Owensboro Canning Co., Inc. (In re Owensboro Canning Co., Inc.)*, 82 B.R. 450, 454 (W.D.Ky.1988) (citations omitted) (finding that courts have summarily rejected "application of so formalistic a rule"); *In re Smith*, 47 B.R. 482, 484 (Bankr. N.D.Ohio 1985) ("Although it was once held that the writing must contain some language which specifically conveys a security interest, ... this rule has since been discarded."); *Simplot v. Owens*, 119

Idaho 243, 805 P.2d 449, 451 (1990) (citation omitted) (noting that "[t]here is no support in legislative history or grammatical logic for the substitution of the word 'grant' for the phrase 'creates or provides for'" in the statutory definition of "security agreement"). Grant Gilmore, a former Comment writer for Article 9, has been especially critical of the *American Card* decision:

> Certainly, nothing in § 9–203 requires that the "security agreement" contain a "granting" clause. The § 9–402 financing statement contained all that was necessary to satisfy the § 9–203 statute of frauds as well as being sufficient evidence of the parties' intention to create a security interest in ... [the described collateral]. No doubt the court would have upheld the security interest if the debtor had signed two pieces of paper instead of one. The § 9–402 provision that a short financing statement may be filed in place of the full security agreement was designed to simplify the operation. The Rhode Island court gives it an effect reminiscent of the worst formal requisites holding under the 19th century chattel mortgage acts.

*Evans*, 183 S.E.2d at 113, *quoting* 1 Gilmore, *Security Interests in Personal Property*, § 11.4 at pp. 347–48 (1965).

About a decade after the *American Card* decision was handed down, the Ninth Circuit weighed in on the issue at the other end of the spectrum. In *Nolden v. Plant Reclamation (In re Amex–Protein Dev. Corp.)*, 504 F.2d 1056 (9th Cir.1974), the court found that a financing statement, standing alone, may qualify as a security agreement, meeting the formal requirements of § 9–203, as long as the financing statement contains a description of the collateral and is signed by the debtor. *Id.* at 1059–60. The Ninth Circuit noted that because a security agreement can serve as

a financing statement, there is "no sound reason why the converse should not be true." *Id.* at 1059, *citing Evans,* 183 S.E.2d at 114. Thus, the court concluded that any written agreement signed by the debtor that states that "personalty is being encumbered as security for a debt" should operate as a security agreement under Article 9 of the UCC. *Id.*

■■■■■ Rejecting both *American Card's* express grant rule and *Amex-Protein's* liberal position, the majority of UCC jurisdictions holds to the general rule that a standard form financing statement, standing alone, cannot be considered a security agreement and, therefore, does not create a security interest in the debtor's property. *See, e.g., Numeric,* 485 F.2d at 1331 (pointing to "[a] considerable body of case law" adopting the rule); *Mid-Eastern Elecs., Inc. v. First Nat'l Bank of S. Md.,* 380 F.2d 355, 356 (4th Cir.1967); *King v. Tuxedo Enters., Inc.,* 975 F.Supp. 448, 453 (E.D.N.Y.1997) (citation omitted) (concluding that a financing statement alone cannot serve as a security agreement "but indicates only that the secured party may have an interest in the described collateral"); *Yoppolo v. Trombley (In re DeVincent),* 238 B.R. 722, 727 (Bankr.N.D.Ohio 1999) (citation omitted) (noting that "under Ohio law a financing statement, in and of itself, does not exhibit the requisite intent to create a security interest"); *Minot Builders Supply v. Ace Lumber Supply, Inc. (In re Ace Lumber Supply, Inc.),* 105 B.R. 964, 969 (Bankr.D.Mont.1989) (citation omitted) (finding that "[t]he financing statement alone 'indicates merely that the secured party who has filed *may* have a security interest in the collateral described'") (emphasis added by court); *Silver Creek Supply v. Powell,* 36 Ohio App.3d 140, 521 N.E.2d 828, 833 (1987) (stating that a financing statement, "unsupported by other documentation, is intended merely to serve

as notice to the general public and was not borne out of an attempt by the legislature to constitute a security agreement"). Although the North Carolina supreme court recognized that a financing statement may double as a security agreement, the court cautioned that such a financing statement is sufficient only if it contains appropriate language to evidence the parties' intent to create a security interest. *Evans,* 183 S.E.2d at 113. The court also noted that a financing statement, by itself, which does no more than meet the statutory requirements, does not create a security interest. *Id.; see also Crocker v. Delta Group, Inc.,* 125 N.C.App. 583, 481 S.E.2d 694, 696 (1997) (citing and applying *Evans* ).

While most authorities conclude that a standard financing statement, in and of itself, does not create a security interest, courts uniformly hold that there are no "magic words" or precise formula necessary to create such an interest, as long as the formal requirements of the UCC are satisfied. *See, e.g., United Va. Bank/Seaboard Nat'l v. B.F. Saul Real Estate Inv. Trust (In re Triangle Inn Assocs.),* 641 F.2d 185, 189 (4th Cir.1981) (citation omitted); *Owensboro,* 82 B.R. at 455; *DeVincent,* 238 B.R. at 726; *Miller v. Krause (In re Krause),* 114 B.R. 582, 593 (Bankr. N.D.Ind.1988); *Winshall v. McCormick (In re McCormick),* 24 B.R. 718, 720 (Bankr.E.D.Mich.1982) (citation omitted); *Evans,* 183 S.E.2d at 113 (citation omitted); *Brockbank v. Best Capital Corp.,* 341 S.C. 372, 534 S.E.2d 688, 692 (2000) (citations omitted). "[A] security agreement need not be denominated as such and need not be a separately executed document to be enforceable." *In re Murray Bros., Inc.,* 53 B.R. 281, 283 (Bankr.E.D.N.C. 1985). *See also Bollinger,* 614 F.2d at 928; *Numeric,* 485 F.2d at 1331; *King,* 975 F.Supp. at 452; *McCormick,* 24 B.R. at 720. Rather, any writing, "regardless of label, which adequately describes the col-

lateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon, ... satisf[ies] both the formal requirements of the statute and the policies behind it." *Numeric,* 485 F.2d at 1331 (citations omitted).

■ Indeed, many courts have found enforceable security interests where no separately executed written agreements existed. *See, e.g., Triangle Inn Assocs.,* 641 F.2d at 189 (deed of trust); *Bollinger,* 614 F.2d at 929 (promissory note and financing statement); *Numeric,* 485 F.2d at 1332 (financing statement and board of directors' resolution); *King,* 975 F.Supp. at 453 (letter agreement and financing statement); *Owensboro,* 82 B.R. at 456 (letter agreement); *In re Carmichael Enters., Inc.,* 334 F.Supp. 94, 105 (N.D.Ga. 1971), *aff'd,* 460 F.2d 1405 (5th Cir.1972) (financing statement and written correspondence); *Smith,* 47 B.R. at 484 (financing statement, loan agreement, promissory note); *McCormick,* 24 B.R. at 720 (application for certificate of title and issuance of certificate); *Cookeville Prod. Credit Assoc. v. Frazier (In re Frazier),* 16 B.R. 674, 679–80 (Bankr.M.D.Tenn.1981) (financing statement alone); *Hite,* 4 B.R. at 550–51 (promissory notes and financing statements); *Simplot,* 805 P.2d at 452 (promissory notes and certificate of title); *Evans,* 183 S.E.2d at 114 (financing statement and promissory note); *Brockbank,* 534 S.E.2d at 693 (installment sales contract). Thus, the weight of authority finds that a formal security agreement is not required under Article 9. This Court agrees. Accordingly, the fact that the parties did not create a separate instrument denominated as a "security agreement" is not fatal to Makino's claim.

### 2. *The Sufficiency of the Makino Documents*

■ Turning to the documents in the case at bar, Makino urges the Court to consider the financing statement in conjunction with the language contained in the terms and conditions of sale accompanying the invoices. Makino argues that, together, these documents satisfy the writing requirement imposed by § 25–9–203. Courts in a number of jurisdictions allow, and in some cases mandate, the review of all documents between the parties to determine whether they intended to create a security interest. *See, e.g., Bollinger,* 614 F.2d at 928 (noting that "[w]hen the parties have neglected to sign a separate security agreement, it would appear that the better and more practical view is to look at the transaction as a whole"); *Numeric,* 485 F.2d at 1332 (citations omitted) (stating that "an adequate agreement can be found when a financing statement is considered together with other documents"); *Quisenberry v. Am. State Bank (In re Quisenberry),* 295 B.R. 855, 860 (Bankr. N.D.Tex.2003) (citation omitted) (finding that the true intention of the parties can be determined by examining the security agreement, as well as all "contemporaneously executed documents"); *Mitchell v. Rock Hill Nat'l Bank (In re Mid–Atlantic Piping Prods. of Charlotte, Inc.),* 24 B.R. 314, 320 (Bankr.W.D.N.C.1982) (citations omitted). This "composite documents rule" permits a court to read a combination of writings together in considering whether the statutory requirements of § 9–203 have been satisfied. *See id.* In *Evans,* the North Carolina supreme court applied this rule, finding that the language of a promissory note, considered together with a financing statement, was sufficient to create a security interest in collateral owned by the debtor on the note. *Evans,* 183 S.E.2d at 114. *See also Crocker,* 481 S.E.2d at 696 (noting that the *Evans* court has held that "separate writings may be considered together to satisfy the statute of frauds requirement"); *Little v. County*

*of Orange,* 31 N.C.App. 495, 229 S.E.2d 823, 825 (1976) (citations omitted). Accordingly, this Court will examine both the language found in the terms and conditions accompanying Makino's invoices and the financing statement filed with the North Carolina Secretary of State.

What must guide this examination is a determination of whether the parties intended to create a security interest. That is, there must be evidence within the transaction documents themselves indicating the parties' intent to create a security interest. *Triangle Inn Assocs.,* 641 F.2d at 189; *Sommers v. Int'l Bus. Machs.,* 640 F.2d 686, 689 (5th Cir.1981) (citation omitted); *Bollinger,* 614 F.2d at 928; *Numeric,* 485 F.2d at 1331; *Farmers Coop. of Ashford, Inc. v. People's Cmty. Bank of Ashford (Ex parte People's Cmty. Bank of Ashford),* 775 So.2d 819, 823 (Ala. 2000); *Silver Creek Supply,* 521 N.E.2d at 832. Indeed, in cases finding security agreements in one or more documents not formally named as such, the "common thread" in every case was the intent to create a security agreement on the face of the instruments executed by the debtor. *Murray Bros.,* 53 B.R. at 284 ("The critical question is whether, 'the documentation as a whole fairly reflects a meeting of the debtor's and creditor's minds on the matter.'") (citation omitted). Ultimately, then, the language of the documents must "'lead[ ] to the logical conclusion that it was the intention of the parties that a security interest be created.'" *Evans,* 183 S.E.2d at 113, *quoting In re Nottingham,* 6 U.C.C. Rep. 1197, 1969 WL 11098 (Bankr.E.D.Tenn.1969).

Determining whether the parties intended to create a security interest is a two-step process. The first step requires the court to decide whether there is a written document or documents containing language that objectively indicates that the parties intended to create a security interest. *Owensboro,* 82 B.R. at 453, *citing S.E.L. Maduro (Florida) Inc. v. Strachan Shipping Co.,* 800 F.2d 1572, 1575–76 (11th Cir.1986) ("[W]hether the writing or writings are sufficient to meet the statutory requirements for a valid security agreement is a question of law"); *Murray Bros.,* 53 B.R. at 285. If such a document or documents exist, then the fact finder must determine whether the parties actually intended to create a security interest. *Crocker,* 481 S.E.2d at 696 (citation omitted). The first inquiry is a question of law; the second is a question of fact. *Owensboro,* 82 B.R. at 453–54 (citation omitted).

The parties in the instant case do not dispute that the financing statement filed by Makino meets the formal requirements of financing statements in general as set out in § 25-9-402. However, the document contains no language adequately evidencing the parties' intent to create a security interest. Instead, the bare-bones financing statement, standing alone, does no more than meet the minimum statutory requirements. Accordingly, that document, standing alone, does not create a security interest in the Machinery.

Looking beyond the financing statement to the terms and conditions accompanying the Makino invoices, the Court finds that these documents fall short of clearly manifesting OMC's intent to grant, create and provide for a security interest as required in *Evans.* Although the language itself strongly demonstrates Makino's intention to create such a security interest, there is no real indication of OMC's acquiescence.

The Court's research reveals no case in which a party asserting a security interest relied on a combination of financing statement and pre-printed invoices as in the

instant case. However, *Expeditors Int'l of Wash., Inc. v. Official Creditors Comm. (In re CFLC, Inc.)*, 166 F.3d 1012 (9th Cir.1999), focused on the sufficiency of pre-printed invoices alone and thus can help to elucidate the issue in this case. In *CFLC*, the plaintiff provided the debtor with transportation-related services and subsequently sent the debtor approximately 330 invoices containing "Terms and Conditions of Service" over a seventeen-month period. *Id.* at 1014. The debtor never signed either the pre-printed invoices or any other agreement including the terms reflected on the invoices. *Id.* Nor did the parties ever discuss or expressly bargain over any of the terms or conditions. *Id.* The Ninth Circuit found that the invoices were insufficient to create a security interest, reasoning that "pre-printed agreements used by a creditor do not create a security interest if the debtor never intended the collateral to be used for this purpose." *Id.* at 1016 (citation omitted).

In the instant case, while the language of the pre-printed invoice terms and conditions reflects Makino's desire to create a security interest, the documents are silent as to OMC's intent. They do not bear the signature of any OMC principal, agent, or other representative to indicate the Debtor's agreement. Nor is there any other evidence in the limited record before the Court that the parties ever discussed or expressly bargained over any of the terms and conditions. In fact, the "Precedence" language stating that receipt by OMC of the Machinery at issue "will be deemed assent" to Makino's terms and conditions highlights the unlikelihood that the parties ever engaged in any kind of meaningful discussion as to the provisions in the documents. *See* Makino's Exh. 2.

Consideration of the financing statement in conjunction with the invoice terms and conditions presents a close call as to whether the documents indicate that the parties intended to create a security interest. However, even if the Court were to find, as a matter of law, that the documents objectively reflect the parties' intent to create a security interest, the Bank disputes that OMC actually intended to do so. Uncertainty of the factual question of OMC's intent raises concern and highlights the need for an opportunity for further investigation. "Summary judgment is not appropriate when further inquiry into the facts of the case is desirable to clarify the application of the law." *Brockbank*, 534 S.E.2d at 692 (citation omitted). Further, "[s]ummary judgment should not be granted when there is no dispute as to evidentiary facts if there is dispute as to the conclusion to be drawn from those facts." *Id.* Finally, the Seventh Circuit has cautioned courts to use summary judgment sparingly when subjective intent is a determinative factor. *Alexander v. Erie Ins. Exch.*, 982 F.2d 1153, 1160 (7th Cir.1993). Because there is a material factual dispute as to OMC's intent to grant Makino a security interest in the subject equipment, disposition of this matter through summary judgment is precluded, and Makino's motion for partial summary judgment is denied.

## V. CONCLUSION

For the foregoing reasons, the Court denies Makino's motion for partial summary judgment. This matter is continued to the pretrial conference which is scheduled for December 22, 2003 at 1:00 p.m.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

### AMENDED ORDER

For the reasons set forth in a Memorandum Opinion dated the 20th day of October 2003, the Court denies the motion of Makino, Inc. for partial summary judgment. This matter is continued to the pretrial conference which is scheduled for December 22, 2003 at 1:00 p.m.