**In the Matter of SARAH MICHAELS, INC., et al., Debtor.**

**Brenda P. Helms, as Trustee, Plaintiff,**

**v.**

**Certified Packaging Corporation, Defendant.**

**CPC Acquisition, Inc., Plaintiff/Intervenor,**

**v.**

**Michael Froman and Brenda P. Helms, as Chapter 7 Trustee, Defendant.**

**Bankruptcy No. 03 B 19465.**
**Adversary No. 05 A 01252.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 11, 2007.

Gordon E. Gouveia, Allen J. Guon, Matthew A. Swanson, James J. Teich, Shaw Gussis Fishman Glantz, Wolfson & Tow, Chicago, IL, for Movant or Plaintiff.

Ralph S. Schindler, Jr., Law Offices of Ralph J. Schindler, Jr., Chicago, IL, Brad Berish, Chad H. Gettleman, Adelman & Gettleman, Ltd., Chicago, IL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER,
Bankruptcy Judge.

This Adversary proceeding relates to the bankruptcy case of Sarah Michaels, Inc., Sarah Michaels, LLC, and Fasma, LLC (collectively, the "Debtors") originally filed under Chapter 11 of the Bankruptcy Code (the "Code"), 11 U.S.C. § 101 *et seq* on May 1, 2003, but converted January 26, 2004 to Chapter 7. A dispute was presented here as to lien priority between the Chapter 7 Trustee and the Plaintiff/Intervenor CPC Acquisition, Inc. over certain assets.

The Chapter 7 Trustee Brenda P. Helms ("Trustee") initiated this Adversary Proceeding by filing a complaint on April 29, 2005 ("Complaint") against Certified Packaging Corporation ("Certified") seeking to avoid and recover certain transfers. Certified failed to respond to the Complaint. Therefore, on November 16, 2005, an Order of Default Judgment was entered in favor of the Trustee and against Certified in the total amount of $2,178,928.01 (the "Default Judgment").

On November 18, 2005, the Trustee sought to enforce the Default Judgment by causing a Citation to Discover Assets (the "Citation") to be served on Certified. On December 12, 2005 Certified filed a Motion to Vacate Default Judgment and for Related Relief. Certified subsequently withdrew that Motion with prejudice pursuant to an Agreed Order Resolving Motion to Vacate Default Judgment and For Related Relief dated January 12, 2006. In the Agreed Order, Certified consented to service of the Citation and to any and all liens which resulted in favor of the Trustee and it agreed not to take any action to vacate the Citation. However, CPC Acquisition, Inc. intervened here to allege a prior lien on affected assets.

Some time before the citation lien arose, pursuant to a loan agreement between CIT Group/Business Credit, Inc. ("CIT") and Certified, CIT was granted a lien on all of Certified's currently owned or hereafter acquired assets including any proceeds thereof. CIT assigned its interest to LaSalle Bank, N.A. ("LaSalle"), and LaSalle later sold its interest to CPC Acquisition, Inc. ("CPCA").

On December 16, 2000 Certified experienced a fire in one of its plants. Certified's insurance company denied coverage. Indeed, there was no coverage because of apparent fault of Certified's insurance broker in not placing coverage as ordered. On January 24, 2006, Certified settled a suit against its insurance broker for $100,000 based on its professional negligence in failing to properly insure the premises. It was determined that Certified's counsel should be paid $12,000 for his work in effecting that recovery, and the remaining $88,000 balance was to be held in escrow by the Trustee pending resolution of this lien dispute. The Trustee and CPCA each claim the $88,000 net settlement proceeds as assets subject to their respective lien claims.

Still pending is a Complaint Certified filed against Commonwealth Edison, an Exelon Company ("ComEd") in the Circuit

Court of Cook County, Illinois. In the ComEd Complaint, Certified alleges, *inter alia*, recovery for damage to its collateral, and also seeks business interruption damages, all in the amount of $2,000,000. Damages are asserted to result from ComEd's "carelessness and negligence" in maintaining a utility and power line which caused the electric fire. The Trustee and CPCA each claim any proceeds of this action as assets subject to their prior liens.

Following trial, the following Findings of Fact and Conclusions of Law are made and to be entered. For reasons stated below and pursuant to a separate judgment order, it is found that the Trustee has a superior lien over CPCA in the $88,000 recovered in the Rothschild Settlement and any interest thereon; that CPCA has a superior lien over the Trustee for any proceeds recovered in the ComEd Action for damage to its collateral; and the Trustee has a superior lien over CPCA for any proceeds recovered in the ComEd action for any recovery other than for damage to collateral.

### FINDINGS OF FACT

Findings of Fact are based on evidence presented at trial, and stipulation of the parties filed herein as to uncontested facts:

#### The Debtor's Cases and Appointment of the Trustee

1. On May 1, 2003 (the "Petition Date") the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois.

2. On May 7, 2003, this Court entered an order allowing the joint administration of the Debtors' three bankruptcy cases (collectively, the "Cases").

3. On January 26, 2004, an Order was entered converting the Cases to ones under Chapter 7 of the Bankruptcy Code.

4. On February 5, 2004, Brenda P. Helms ("Trustee") was appointed as the Chapter 7 Trustee of the Debtors' bankruptcy estates pursuant to 11 U.S.C. § 701(a)(1).

#### The Trustee's Adversary Proceeding and Default Judgment Against Certified Packaging Corporation

5. On April 29, 2005, the Trustee initiated the above-captioned Adversary Proceeding by filing a complaint against Certified Packaging Corporation ("Certified") to avoid and recover certain transfers. (Stip. ¶ 1.)

6. On November 15, 2005, this Court made and caused to be entered Findings of Fact and Conclusions of Law and an Order of Default Judgment in favor of the Trustee and against Certified in the amount of $2,100,070.13, plus prejudgment interest in the amount of $78,707.88, plus costs of $150.00, for a total judgment in the amount of $2,178,928.01 (the "Default Judgment"). (Stip. ¶ 2.)

7. On November 18, 2005, the Trustee commenced a supplementary proceeding to enforce the Default Judgment by having the Clerk of the Bankruptcy Court issue a Notice of Citation and Citation to Discover Assets (the "Citation") on Certified, which the Trustee served on Certified. (Stip. ¶ 3; Stip. Ex. A.)

8. On May 18, 2006, this Court entered an order extending the termination date of the Citation for six months from the date of its original termination, through and including November 28, 2006. (Stip. ¶ 4.) On December 1, 2006, this Court entered an order extending the termination date of the Citation for an additional six months, through and including May 28, 2007.

9. On December 12, 2005 Certified filed a Motion to Vacate Default Judgment and for Related Relief ("Motion to Vacate"), which Certified subsequently with-

drew with prejudice pursuant to an Agreed Order Resolving Motion to Vacate Default Judgment and For Related Relief dated January 12, 2006 ("January Agreed Order"), whereby Certified consented to the Citation and to any and all liens which arose in favor of the Trustee and agreed not to take any action to vacate the Citation. (Stip. ¶ 5; Stip. Ex. B.)

### Certified Packaging Corporation's Loan with LaSalle Bank and the U.C.C. Sale

10. On or about March 29, 2000, Certified entered into a Loan and Security Agreement with CIT Group/Business Credit, Inc. ("Security Agreement"). (Stip. ¶ 6; Stip. Ex. C.)

11. On March 27, 2000 and June 5, 2000, respectively, CIT Group/Business Credit, Inc. ("CIT") filed U.C.C.–1 financing statements with respect to Certified (the "CIT Financing Statements"). (Stip. ¶ 7; Stip. Ex. D.)

12. On or about June 11, 2001, CIT assigned (the "Assignment") its interest as Certified's lender to LaSalle Bank, N.A. ("LaSalle"). (Stip. ¶ 8; Stip. Ex. E.)

13. On August 28, 2001, LaSalle filed U.C.C. financing statements (the "LaSalle Financing Statements") with respect to the Assignment and describing as collateral, amongst other things, commercial tort claims. On or about January 31, 2005 LaSalle filed a continuation statement (the "Continuation Statement") with respect to the CIT Financing Statement. (Stip. ¶ 9; Stip. Ex. F.)

14. On May 20, 2002, Certified and LaSalle executed the Second Amendment to Loan and Security Agreement (the "Amended Certified Security Agreement"). The Certified Security Agreement was amended from time to time after May 20, 2002. (Stip. ¶ 10; Stip. Ex. G.)

15. The Amended Certified Security Agreement defines "Collateral" to include, *inter alia*, "Commercial Tort Claims listed on Schedule B hereto." *See id.* The Amended Certified Security Agreement further provides that certain defined terms including, *inter alia*, "Commercial Tort Claims" and "General Intangibles" "shall have the respective meanings assigned to such terms in the Illinois Commercial Code." *See id.*

16. No claims are listed on Schedule B of the Amended Certified Security Agreement. *See id.* at Schedule B.

### The Rothschild Action

17. Certified conducted business on the premises of 3800 Hawthorne Court, Waukegan, Illinois (the "Waukegan Facility") and 1950 Marquette Street, North Chicago, Illinois (the "North Chicago Facility"). In December 2000, there was an electric fire at the North Chicago Facility. (Trial Tr., 51, Oct. 16, 2006.) The fire damaged all equipment and machinery that was connected to an electric source. (Trial Tr., 51–54, Oct. 16, 2006.) In the process of extinguishing the fire, inventory, equipment, and merchandise incurred water damage. (Trial Tr., 51–54, Oct. 16, 2006.) The North Chicago Facility was shut down for approximately one to two months and never again became fully operational. (Trial Tr., 54, 54, Oct. 16, 2006.)

18. Prior to the fire, Certified submitted to LaSalle an appraisal report on the value of assets at the North Chicago Facility. (Ex. P–1.) The value of the equipment and machinery at the North Chicago Facility ten months before the fire was valued at $576,125. (Ex. P–1 at 17.) The fire caused a loss to inventory and business interruption in excess of $1,000,000. (Trial Tr., 54, 96, Oct. 16, 2006.)

19. Because of the damage caused by the fire, Certified filed a claim with its insurance agent, Rothschild Insurance Agency, who submitted the claim to the

carriers, Indiana Insurance and Hartford Boiler ("Indiana"). (Trial Tr., 55, Oct. 16, 2006.) Indiana denied coverage noting that the North Chicago Facility was not listed on the policy, though the building was listed on the Certificate of Insurance provided to Certified and LaSalle. (Ex. P–4.)

20. On February 8, 2002, Certified filed a lawsuit in the Circuit Court of Cook County, Chancery Division, entitled *Certified Packaging Corporation v. Indiana Insurance Company, Hartford Steam Boiler Inspection and Insurance Company, and Rothschild Insurance Agency*, Case No. 02 CH 2952 (the "Rothschild Complaint"). (Stip. ¶ 13; Stip. Ex. H.)

21. The Rothschild Complaint consisted of five counts, including Count V against Rothschild Insurance Agency, Inc. and Ed Norcutt, Jr. (the "Rothschild Defendants"). (Stip. Ex.H.) In Count V, Certified alleged the "carelessness and professional negligence" of the Rothschild Defendants in "fail[ing] to provide the insurers with the correct business premises address on renewal of [certain insurance] policies ... "resulting in enormous and significant losses" to Certified and the Rothschild Defendants' "breach of [their] duty of care and duty to provide coverage and placement of insurance for all of the plaintiffs business locations ... which was "a proximate cause of Hartford's refusal to pay [Certified's] business interruption loss." *See id.* at 11–12.

22. In Counts I–IV of the Rothschild Complaint, Certified sought recovery against Indiana and Hartford Steam Boiler Inspection and Insurance Company ("Hartford") for coverage under certain insurance policies and vexatious delay in the payment of insurance procedures under Illinois law. (Stip. ¶ 15; Stip. Ex. H at 3–11.)

23. According to the Mediation Submission of Defendants Rothschild Insurance Agency and Ed Norcutt, Jr. (the "Mediation Submission") and an Order dated September 23, 2003 (the "Dismissal Order"), Counts I–IV of the Rothschild Complaint were dismissed voluntarily and/or by agreement, leaving only Count V against the Rothschild Defendants. (Stip. ¶ 16; Stip. Ex. I–J.)

24. Certified's claim against the Rothschild Defendants was settled for $100,000.00 (the "Rothschild Settlement"). The Rothschild Settlement is reflected in a letter dated January 23, 2006 from Certified's attorney, Michael S. Froman ("Froman") to Certified's president, Irwin Morris ("Morris"), the Release signed by Morris and dated January 24, 2006, and checks from Rothschild Agency, Inc. and its insurer, Utica National Insurance Group, in the amounts of $5,000.00 and $95,000.00, respectively. (Stip. ¶ 17; Stip. Ex. K.)

25. Pursuant to the Agreed Order Resolving Motion To Compel Michael S. Froman & Associates To Deliver Assets To The Trustee dated June 1, 2006 (the "June Agreed Order"), Froman released any and all interests and/or claims against the proceeds of the Rothschild Settlement and the ComEd Action (defined below) and agreed to deliver $88,000 of the proceeds from the Rothschild Settlement (the "Rothschild Settlement Proceeds") to the Trustee, which are being held in escrow pending further order of the Court. (Stip. ¶ 18; Stip. Ex. L.)

### The Commonwealth Edison Action

26. On or about December 16, 2005, Certified commenced another lawsuit by filing a complaint (the "ComEd Complaint") in the Circuit Court of Cook County entitled *Certified Packaging Corporation v. Commonwealth Edison*, Case No. 05 L 14147 (the "ComEd Action"), which is

currently pending. (Stip. ¶ 19; Stip. Ex. M.)

27. In the ComEd Complaint, Certified alleges, *inter alia,* property damages and business interruption damages in the amount of $2,000,000.00 arising out of Commonwealth Edison's "carelessness and negligence" in maintaining a utility and power line. (Stip. ¶ 20; Stip. Ex. M.)

28. Pursuant to the Court's Order Granting Motion To Compel Certified Packaging Corporation To Execute An Assignment Of Its Claim Against Commonwealth Edison To The Trustee dated April 25, 2006 (the "Assignment Order"), Certified executed an assignment of the ComEd Action to the Trustee. The ComEd Action is being held by the Trustee in escrow pending further order of the Court. (Stip. ¶ 21; Stip. Ex. N.)

**The U.C.C. Sale and CPC Acquisition, Inc.'s Acquisition of Certified's Assets**

29. On January 20, 2006, LaSalle exercised its rights as Certified's secured lender to enter into a U.C.C. sale with CPC Acquisition, Inc. ("CPCA") of the assets of Certified in which it had a security interest (the "Sale Agreement"). (Stip. ¶ 22; Stip. Ex. 0.)

30. On or about February 1, 2006, LaSalle conducted a U.C.C. sale (the "U.C.C. Sale") of substantially all of the assets of Certified pursuant to § 9–610 of the U.C.C. and CPCA was the successful bidder. (Stip. ¶ 23.)

31. On February 10, 2006, CPCA purchased the assets of Certified pursuant to the terms of the Sale Agreement. (Stip. ¶ 24.)

32. On April 7, 2006, CPCA filed the Intervenor's Complaint For Declaratory Judgment To Determine Rights To Certain Assets And Avoid Trustee's Claim, and on April 18, 2006, this Court entered an order granting CPCA's motion to intervene in the Citation Proceeding.

33. On June 12, 2006, CPCA filed the Intervenor's First Amended Complaint alleging, *inter alia,* that CPCA has superior right, title, and interest in the Rothschild Settlement Proceeds and the ComEd Action.

34. Statements of fact contained in the Conclusions of Law shall constitute additional Findings of Fact.

### CONCLUSIONS OF LAW

#### JURISDICTION

Jurisdiction lies here under 28 U.S.C. § 1334, and the case is referred by the District Court under Internal Operating Procedure 15(a). Determination of the validity, extent, or priority of a lien is a core proceeding under 28 U.S.C. § 157(b)(2)(K). Venue lies here under 28 U.S.C. § 1409(a).

#### INTRODUCTION

CPCA argues that it should be awarded the $88,000 from the Rothschild Settlement and the first $1,112,00 awarded, if any, in the ComEd Action based on three possible theories:

(1) 810 ILL. COMP. STAT. 5/9–102(a)(64) defines these assets as "proceeds" of damaged collateral covered by the Amended Certified Security Agreement

(2) Both are commercial tort claims and the documents in LaSalle's loan file objectively demonstrate that Certified intended to grant a secured interest in those claims and identify these commercial tort claims beyond the mere "type" of U.C.C. asset.

(3) Pursuant to 810 ILL. COMP. STAT. 5/9–109 cmt. 15, the $88,000 is a "payment intangible" which LaSalle attached on May 20, 2002 via the

Amended Certified Security Agreement.

### I. *The Trustee Has a Valid Citation Lien under Illinois Law as Made Applicable by Fed. R. Bankr.P. 7069*

Pursuant to Rule 7069 of the Federal Rules of Bankruptcy Procedure, the Illinois procedures on execution, in proceedings supplementary to and in aid of judgment, apply to this Citation Proceeding. 735 ILL. COMP. STAT. 5/2–1401 *et. seq.;* Fed. R. Bankr.P. 7069.

■ Under Illinois procedures of execution, by serving the Citation on Certified, the Trustee perfected her judgment lien on all personal property belonging to Certified that was in its possession or control or which would thereafter be acquired or come due to Certified until the disposition of the Citation. 735 ILL. COMP. STAT. 5/2–1402(m)(1); *Cacok v. Covington,* 111 F.3d 52, 54 (7th Cir.1997) ("The lien is considered perfected as of the date of service of the citation."); *In re Nowicki,* 202 B.R. 729, 737 (Bankr.N.D.Ill.1996) ("Section 1402 allows a creditor to perfect its lien in property of a judgment debtor against which the creditor may seek satisfaction of its judgment by serving a citation to discover assets on the debtor and, if applicable, on the third party holding such assets."); *State Bank of Piper City v. A Way, Inc.,* 135 Ill.App.3d 1010, 90 Ill.Dec. 641, 482 N.E.2d 620, 624 (1985) (finding that for purpose of judgment creditor's citation proceedings to discover judgment debtor's assets, judgment creditor was not required to establish either existence or perfection of security interest, its amount, or that security interest in judgment debtor's asset in possession of third party had priority over any interests of third party and judgment debtor).

■ The lien created by the Citation "binds nonexempt personal property, including money, choses in action, and effects of the judgment debtor ..." 735 ILL. COMP. STAT. 5/2–1402(m). The term "chose in action" includes negligence lawsuits. *See Gonzalez v. Profile Sanding Equip., Inc.,* 333 Ill.App.3d 680, 695, 267 Ill.Dec. 295, 776 N.E.2d 667 (2002). As was explained:

> We find [chose in action] akin to an instance where a party has a "cause" *for some duty due to him or her,* or something similar to "rights" under a contract or a breach of that contract. In other words, it is not potential or inchoate; rather, it is an issue that has been the subject of litigation or, at the very least, is in the process of being litigated.

*Id.* (emphasis supplied).

■ "Chose in action" encompasses the Rothschild Action and the ComEd Action which involve Certified's claims for the breach of certain duties it was owed. Count V of the Rothschild Complaint, the only remaining Count prior to the Rothschild Settlement, alleged that Rothschild's "breach of its duty of care and duty to provide coverage and placement of insurance for all of [Certified's] business locations is a proximate cause of Hartford's refusal to pay the business interruption loss ..." (Jt.Ex.H.) It also alleged that Certified did not have coverage for business interruptions and losses "as a result of the carelessness and professional negligence of defendant Rothchild, its agent, servants, and employees, including but not limited to Ed Norcutt, Jr." *Id.*

The ComEd Complaint alleges that ComEd's "carelessness and negligence" in breaching its duty to maintain its utility pole and power line in a safe manner is a direct and proximate cause of damages incurred by Certified. (Jt.Ex.M.) Thus, "chose in action" encompasses the ComEd Action.

### A. The $88,000 Recovered in the Rothschild Settlement Do Not Constitute "Proceeds" of Damaged Collateral

CPCA argues that the amount recovered in the Rothschild Settlement constitutes "proceeds" of damaged collateral covered under the Amended Certified Security Agreement. CPCA thus argues that it has superior lien rights in the Rothschild Settlement because the Amended Certified Security Agreement covers "proceeds" of collateral.

Proceeds are defined as the following:

(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B) whatever is collected on, or distributed on account of, collateral;

(C) rights arising out of collateral;

(D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

(E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

810 ILL. COMP. STAT. 5/9–102(a)(64).

The amount recovered in the Rothschild Settlement cannot represent insurance proceeds, as the insurers denied coverage to Certified. (Trial Tr., 55, Oct. 16, 2006; Jt. Ex. H.) Irwin Morris, vice president of sales for CPCA and former president and one-third owner of CPC, testified as follows:

Q: So apart from that [50–some–thousand dollars], you received nothing on your entire insurance claim?

A: That is correct.

Q: And you received nothing because there was no coverage, insurance coverage, effectively?

A: That is correct.

Q: That is what the circuit court found; is that correct?

A: Yes.

(Trial Tr., 86, Oct. 16, 2006.)

There is no indication at all showing that the amount recovered from the Rothschild Settlement constitutes "proceeds" of damaged collateral. Indeed, the Rothschild Settlement arose from the Rothschild Agency's professional negligence (i.e., the negligent failure to provide insurance coverage). Prior to the Rothschild Settlement, Counts I–IV of the Rothschild Complaint were dismissed voluntarily and/or by agreement, leaving only Count V against the Rothschild Defendants. (Stip. ¶ 16; Stip. Ex. I–J.) Count V of the Complaint against Rothschild Insurance Agency, the insurance broker, and Ed Norcutt, Jr., an agent for Rothschild Insurance Agency, is related to its alleged negligent failure to procure insurance. (Trial Tr., 79, Oct. 16, 2006.) Count V is not an action seeking recovery for damaged collateral.

Based on this evidence, it is clear that the Rothschild Action was not a claim arising out of damage to collateral within the meaning of 810 ILL. COMP. STAT. 5/9–102(a)(64). Accordingly, the funds recovered from the Rothschild Settlement do not constitute "proceeds" of damaged collateral.

### B. CPCA Has a First Lien on Any Amounts Recovered for "Proceeds" of Damaged Collateral in the ComEd Action

CPCA argues that the first $1,112,000 awarded, if any, in the ComEd Action constitutes "proceeds" of damaged collateral covered under the Amended

Certified Security Agreement. Thus, according to CPCA, it has a lien superior to the Trustee to the proceeds, if any, in the ComEd Action.

In the ComEd Action, Certified seeks to recover $2,000,000 for property damage and business interruption damages. (Jt.Ex.M.) According to the evidence and testimony presented at trial, there was only about $200,000 worth of damage to Certified's equipment as a result of the fire. (Trial Tr., 53, 94–96, Oct. 16, 2006.) Also in evidence is an appraisal report conducted on February 28, 2000. According to the appraisal report, the value of the equipment and machinery at the North Chicago Facility ten months before the fire was valued at $576,125. (Ex. P–1 at 17.)

Pursuant to the Amended Certified Security Agreement, LaSalle's security interest extended to "all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property . . ." (Stip. Ex.G.) While the bulk of Certified's damages may relate to business interruption, CPCA has a first lien that primes Trustee's lien only on any amounts recovered in the ComEd Action for damage to collateral pursuant to the Amended Certified Security Agreement.

As discussed below, the ComEd Action was not listed as a commercial tort claim in the Amended Certified Security Agreement. However, this does not bar CPCA from exercising its first lien rights to any amounts recovered based on damage to its collateral. If CPCA had properly perfected the ComEd Action as a commercial tort claim, it might have had an additional claim in any business interruption damages as well. However, because it failed to do so, it is only entitled to any amounts recovered in the ComEd Action for damage to its collateral.

Presumably, the parties pursuing the ComEd Action will seek a finding by that court or jury as to which damages, if any, are awarded as damage to collateral and which damages, if any, are awarded as business interruption damages.

## II. *The Rothschild Action and the ComEd Action Are Not Commercial Tort Claims Covered by the Amended Certified Security Agreement*

■ CPCA has no right, title, and interest as LaSalle's successor in interest pursuant to the U.C.C. Sale in the Rothschild Action or the ComEd Action, which are commercial tort claims under Article 9 of the U.C.C.

A commercial tort claim is a claim arising in tort with respect to which the claimant is an organization. 810 ILL. COMP. STAT. 5/9–102(a)(13). The Rothschild Action and ComEd Action assert negligence claims and thus constitute tort claims under black letter Illinois law. *See Giordano v. Morgan,* 197 Ill.App.3d 543, 143 Ill.Dec. 875, 554 N.E.2d 810, 814 (1990); *Joe & Dan Int'l Corp. v. U.S. Fid. & Guar. Co.,* 178 Ill.App.3d 741, 750, 127 Ill.Dec. 830, 533 N.E.2d 912 (1988) (negligence claim against insurance broker, the insurance company, and the agent of the insurance company for failure to provide insurance sounded in tort). The plaintiff in the Rothschild Action and the ComEd Action, Certified, is a corporation. Thus, the Rothschild Action and the ComEd Action constitute commercial tort claims.

Pursuant to the U.C.C. Sale between CPCA and LaSalle, CPCA's lien rights in these commercial tort claims are dictated by LaSalle's lien rights, as CPCA is LaSalle's successor in interest. CPCA believes that LaSalle, and now CPCA as LaSalle's successor in interest, possessed a lien in these commercial tort claims pursuant to the Amended Certified Security

Agreement. Thus, CPCA argues that the Uniform Commercial Code sale wiped out the Trustee's junior lien in these commercial tort claims pursuant to 810 ILL. COMP. STAT. 5/9–617 (provision providing that the purchaser in a U.C.C. sale takes the assets sold free and clear of claims of junior security holders). This logic, however, assumes that LaSalle possessed a lien in these commercial tort claims prior to the sale to CPCA. The evidence in this case, however, does not support such an assumption. Contrary to CPCA's argument, the U.C.C. Sale did not wipe out the Trustee's superior citation lien.

Pursuant to 810 ILL. COMP. STAT. 5/9–617, a U.C.C. Sale only discharges *subordinate* security interests and *subordinate* liens. *See id.* (emphasis supplied). The U.C.C. Sale Agreement confirms that CPCA purchased all of Certified's right, title and interest in certain assets "to the extent that such assets have been pledged to [LaSalle] and [LaSalle] has a security interest therein." (Jt.Ex.O.) The extent of CPCA's interests (or lack thereof) in the Rothschild Action and the ComEd Action are governed by the Amended Certified Security Agreement, which granted LaSalle a security interest in various assets, including "Commercial Tort Claims listed on Schedule B hereto." (Jt. Ex. G at § 1(c) and (h).) Schedule B does not list any commercial tort claims. Despite the fact the Amended Certified Security Agreement was amended several times, Schedule B was never amended to include any commercial tort claims. *Id.*

██ A security interest attaches only if a signed security agreement properly describes collateral. *See* 810 ILL COMP. STAT. 5/9–203(a), (b)(3)(A) (explaining that a security interest attaches to collateral when it becomes enforceable against the debtor and that a security interest is enforceable when the debtor has authenticated a secu-

rity agreement that provides a description of the collateral). A security interest attaches and is enforceable as soon as "the debtor has signed a security agreement which contains a description of the collateral, value has been given, and the debtor has rights in the collateral." *Sears, Roebuck & Co. v. Conry,* 321 Ill.App.3d 997, 1000, 255 Ill.Dec. 178, 748 N.E.2d 1248, 1250 (2001); *UNI Imports, Inc. v. Aparacor, Inc.,* 978 F.2d 984, 987 (7th Cir.1992).

CPCA argues that LaSalle's failure to amend Schedule B to include the Rothschild Action and the ComEd Action is not fatal because the documents found in LaSalle's loan file and produced at trial, namely the insurance declarations, the financial statements submitted to LaSalle, the audit memorandum, the settlement authorization for the claim against Indiana, the Board Resolutions and the authorization to settle the Rothschild claim originally issued by LaSalle to Certified provide "objective" evidence that Certified granted an interest in those claims.

These documents, however, do not comprise part of the Amended Certified Security Agreement. Rather, the Amended Certified Security Agreement purports to grant LaSalle a security interest in commercial tort claims *listed on Schedule B.* However, Schedule B fails to list the description of any tort claims whatsoever.

"Revised Article 9 of the Uniform Commercial Code contains detailed provisions regarding descriptions of personal and real property, which are applicable, inter alia, to the requirement that a written security agreement provide a description of the collateral." 33 William H. Danne Jr., Ill. Law and Prac., § 64 (2006). As a general rule, a description of personal or real property is sufficient if it reasonably identifies what is described. *Id.*

Significantly, Article 9 of the U.C.C. has requirements regarding the sufficiency of

descriptions for commercial tort claims. 810 ILL. COMP. STAT. 5/9–108 cmt. 5(d). In particular, 810 ILL. COMP. STAT. 5/9–108(e)(1) provides that "a description only by type of collateral defined in the Uniform Commercial Code is an insufficient description of … a commercial tort claim." The commentators to revised Article 9 predicted the pitfall that has befallen CPCA by virtue of LaSalle's failure to list the Rothschild Action and the ComEd Action in Schedule B to the Amended Certified Security Agreement. 810 ILL. COMP. STAT. 5/9–102 (42) cmt. 5 (explaining that an important consequence to the creation of a separate category for commercial tort claims is the adequacy of the description in the security agreement).

CPCA argues that the description requirements referenced above only requires that the grant of a security interest in a commercial tort claim merely go beyond naming the commercial tort claim by type alone. CPCA fails to recognize, however, that the Certified Security Agreement failed to list any commercial tort claims whatsoever. While Certified and LaSalle may have specifically referenced the claims arising out of the fire from December 2000, they failed to reference the Rothschild Action and the ComEd Action in the Amended Certified Security Agreement. Despite amending the Amended Certified Security Agreement on several other occasions, the parties failed to ever amend it to include any commercial tort claims in Schedule B.

■ CPCA urges this Court to apply the composite documents rule to find both commercial tort claims covered by the Amended Certified Security Agreement. Some courts allow, and in some cases mandate, the review of all documents between the parties to determine whether they intended to create a security interest. "This 'composite documents rule' permits a court to read a combination of writings together in considering whether the statutory requirements of § 9–203 have been satisfied." *In re Outboard Marine Corp.,* 300 B.R. 308, 323 (Bankr.N.D.Ill.2003). CPCA relies on an opinion by Judge Squires in *In re Outboard Marine Corp.* to support this argument. 300 B.R. 308 (Bankr.N.D.Ill. 2003). CPCA's reliance on this decision is misplaced.

In *In re Outboard Marine,* a creditor filed a financing statement but neglected to execute a formal security agreement to enforce its secured claim. It was explained that "[t]he formal requirement that a security agreement … be in writing is in the nature of the statute of frauds" and "the anti-fraud function of the written security agreement serves mostly to protect third-party creditors." *Id.* at 320. Moreover, it was noted that "[t]he security agreement also serves an evidentiary function in order to foreclose the possibility of disputes as to exactly which items of property are covered by a security interest." *Id.* Significantly, the Court noted that, "many courts have found enforceable security interests where no separately executed written agreements existed." *Id.* at 323.

Neither *In re Outboard Marine* nor any of the other cases cited by CPCA in support of the composite documents rule support the proposition that extraneous documents read in conjunction with an otherwise valid security agreement give rise to or amend a security interest in collateral that is not described with the specificity required by Article 9. *See, e.g., In re Sabol,* 337 B.R. 195, 196 (Bankr. C.D.Ill.2006).

■ In *In re Sabol,* the trustee argued that the creditor bank did not have a valid security agreement because there was no separate document captioned "Security Agreement" or any language in any other document explicitly granting a security in-

terest. The bank, however, relying on the composite documents rule argued that the loan application, the promissory note, the authorization and the financing statement, taken together, established an agreement to create a security agreement. *Id.* at 197–98. Where, as here, there is an otherwise valid security agreement, extraneous documents and indications of the parties' intent within in those documents are irrelevant to a determination of the extent of the security interest created by a formal security agreement.

CPCA also relies on *In re Michelle's Hallmark Cards & Gifts, Inc.,* 219 B.R. 316 (Bankr.M.D.Fla.1998). *In re Michelle's Hallmark Cards & Gifts, Inc.* is not *stare decisis* binding judges of this District, and it is not applicable to decide the present issue. Moreover, this case is distinguishable for at least three reasons: (1) it did not involve commercial tort claims that must be described with specificity; (2) the exhibits and schedules that were supposed to list the assets were missing, not blank; and (3) the court only relied on documents that were referenced in the security agreement or executed contemporaneously with the security agreement. *Id.* at 319–20.

In this case, a valid security agreement exists. Schedule B to the valid security agreement which is to list any commercial tort claims covered by the security agreement is not missing, it is blank. LaSalle erred by failing to amend Schedule B to list the Rothschild Action and the ComEd Action. CPCA cannot now seek refuge in the composite documents rule and avoid the Trustee's claim.

**III.** *The Rothschild Settlement Is Not a "Payment Intangible" Covered by the Amended Certified Security Agreement*

■ CPCA argues that the Rothschild Action converted from a commercial tort claim to a payment intangible when it was settled. Pursuant to the Amended Certified Security Agreement, LaSalle attached all "now or hereafter owned ... contract rights, payment intangibles, security interests ..." on May 20,2002. (Jt.Ex.G.) Therefore, CPCA argues that the settlement proceeds are a payment intangible covered by the Amended Certified Security Agreement.

Under the U.C.C. revised Article 9, the asset type "general intangible" contains a subset, "payment intangible," which specifically includes payments from commercial tort claims. Payment intangible "means a general intangible under which the account debtor's principal obligation is a monetary obligation." 810 ILL. COMP. STAT. 5/9–102(a)(61).

In arguing that the Rothschild Action converted from a commercial tort claim to a payment intangible upon settlement, CPCA ignores the significant fact that the Trustee had a valid judgment lien in place at that time. In that regard, the case relied on by CPCA, *In re Wiersma,* is distinguishable on its facts. 324 B.R. 92, 103 (9th Cir. BAP 2005). In *Wiersma,* it was found that the Bank's security interest extended to Debtors' interest in the settlement proceeds. Unlike the facts in this case, however, *Wiersma* did not involve a lien dispute between an intervening judgment creditor, like the Trustee, whose citation lien predated the settlement of the commercial tort claim.

LaSalle attached its interests in any "payment intangibles" in May 2002 pursuant to the Amended Certified Security Agreement. On November 18, 2005, a Citation was issued on behalf of the Trustee. The Rothschild Settlement occurred in January 2006. Because the Trustee had a priority citation lien on the Rothschild Ac-

tion as a "chose in action" under Illinois law, the settlement of the Rothschild Action in January 2006 and the conversion of the Rothschild Action from a "commercial tort claim" to a "payment intangible" did not elevate LaSalle's security interest over the Trustee's priority citation lien.

## CONCLUSION

For reasons stated, this Court will by separate judgment adjudge and declare that the Trustee has exclusive right, title, and interest to the $88,000 of proceeds in the Rothschild Settlement plus any interest thereon; that CPCA has a superior lien over the Trustee for any proceeds recovered in the ComEd Action for damage to its collateral; and that the Trustee has a superior lien on any other proceeds recovered in that case.